HIGGINS, Justice.
 

 This is an action ex delicto to recover damages for personal injuries alleged to have been sustained as a result of the defendant’s employee negligently running into the plaintiff with a motor work car. Plaintiff also pleaded the doctrine of last clear chance.
 

 Defendant denied that it was in any way at fault and averred that the plaintiff was guilty of contributory negligence in attempting to cross the tracks without stopping, looking, or listening.
 

 There was judgment dismissing the suit and the plaintiff appealed. The Court of Appeal held that the plaintiff’s “own fault was the proximate cause of the disaster” and that the doctrine of last clear chance had no application. 170 So. 396. Plaintiff applied to this court for writs, mainly on the ground that the Court of Appeal erred in not permitting recovery as a matter of law on the admitted facts of the case, under the doctrine of last clear chance.
 

 The undisputed facts in the case are as 'follows:
 

 The defendant has two railway tracks located on its road bed, a north track, which is the main line, and a south, track, which is a passing track, both running east and west to the place where the accident occurred in the town of Boutte, St. Charles parish; that at this point there is a 500-foot straightaway in both directions and there is nothing to interrupt one’s view; that there is a well-beaten and publicly known foot path across the tracks and the right of way used by people in that neighborhood for several, years in going to the post office and the grocery store which are located on the north side of the tracks; that this foot path was not dedicated as a public crossing, the public.highway being about 500 feet farther to the east; that defendant’s employee was well apprised of these facts, because he states that he lived in the town of Boutte for about six years and that he was familiar with the locus in quo; that on November 1, 1934, at about 4:30 p. m. (a clear, dry evening), plaintiff attempted to cross from the south to the north side of the tracks for the purpose of going to the store located near the post office on the north side of the tracks; that she had crossed the passing or south side track and the space between the two sets of tracks and just as she stepped upon the south rail of the main line or north track, she was struck by a motorcar which had approached from the west, or plaintiff’s rear left side, and was going eastward, and she was knocked down between the main and the passing tracks.
 

 Defendant’s operator of the motorcar described the accident as follows :
 

 “Q. Mr. Prejean, that water tower is around the bend?
 

 
 *1011
 
 “A.
 
 It isn’t far from where the bend begins, but it is in plain view from that road crossing.
 

 “Q. But I want to be clear that the base of the water tower itself is past the bend in the road; there is no doubt about that, is there?
 

 “A.
 
 You can see the main foundation of the piers; they are larger than the piers themselves.
 

 “Q. But you told us this morning that the straightaway between the scene of the accident and the bend
 
 was around 500 feet.
 

 “A. Approximately 500 feet.
 

 “Q.
 
 Now, Mr. Prejean, when was it that you noticed these two or three people ? You said you probably noticed them but didn’t pay any attention. When was it you noticed them ?
 

 “A. Well, I can’t say exactly.
 

 “Q. You could have seen them from the time you reached the bend, or maybe before; isn’t that true?
 

 “A.
 
 Not when I was going around the bend;
 
 I wasn’t looking for nobody. Usually around crossings, you are supposed to look, and,
 
 when I threw my head up, that’s •when she wheeled around.
 

 “Q. You realized you were coming to a regular crossing?
 

 “A.
 
 Yes, sir, because there is children there and I am more careful — in fact, at any crossing; that’s the instructions.
 

 “Q. So if you had looked at the time you entered the straightaway, you could have .seen these people?
 

 “A. I could have seen them, but the accident couldn’t have been avoided, because she
 
 just deliberately jumped in front of me.
 
 * * *
 

 “Q. When did you first notice Olivia Hicks ?
 

 “A.
 
 Well, I was coming with my head down, and just as I looked up, she was standing there about 40 feet when I noticed her—
 
 a little further than that.
 

 “Q.
 
 She was about
 
 40 feet from you when you lifted your head up and saiv her?
 

 “A.
 
 No, Sir, I saw her before then.
 

 “Q.
 
 How far were you from her when you saw her first?
 

 “A. I wasn’t noticing;
 
 there was about two or three on one side, and she was standing on the other.
 

 “Q.
 
 There were two or three women on one side of the tracks?
 

 “A.
 
 I think two.
 

 “Q. And she
 
 was standing on the other track?
 

 “A. Yes, Sir.
 

 “Q.
 
 Had you come out of the bend when you first noticed her?
 

 “A. No, Sir, I didn’t notice her that far; I had my head down.
 

 “Q. How far from the scene of the accident were you when you first noticed her?
 

 “A. I noticed her when she made a motion to turn around. She turned opposite to where I was coming from.
 
 I was then about 40 feet when she made that motion.
 

 “Q. That was the first time you had
 
 no
 
 ticed her?
 

 
 *1013
 
 “A.
 
 I probably had noticed her before,
 
 but my attention was on the bond wires. I see people walking up and down there, but I wouldn’t positively say that I did see her before she made a motion to turn around.
 

 “Q. Where was she with regard to your tracks when you noticed her?
 

 “A.
 
 When I noticed her,
 
 she was standing with her right foot on the north rail of the passing track,
 
 and I was on the main line,
 
 and she had her back partly turned to me,
 
 and, just as she made a motion to turn around, I saw that she was coming toward the main line and I hollered twice, “hey there,” and, of course, by the time I noticed her, I had to cut the switch off, which is the coaster valve, and the electrical part also, then reached for the brake, and I applied the brake
 
 with such a force that the motor car skidded about 26 feet.
 

 “Q.
 
 Now, you have pretty well covered the situation already but I would like you to check over one or two phases of the matter. As nearly as you can recall, when did you first see Olivia?
 
 About how far away from her were you when you first saw her?
 

 “A.
 
 I'couldn’t say exactly. I still had my attention on the rail, and
 
 I just happened to look up zvhen she made a motion to turn.
 

 “Q.
 
 Well, let me ask you this:
 
 Do you recall whether you saw her prior to the time she started for the track?
 

 “A.
 
 Well,
 
 I seen three or four
 
 probably standing there, but I wouldn’t say positively that I saw her or could remember exactly who it was, or anything like that.
 
 I saw her standing there.”
 
 (Italics ours.)
 

 He further stated that from time to time he cut off the motor and let the car coast in order not to get up too much speed so as to be able to examine the wirings attached to the rails controlling the block signals; that from the time he saw the plaintiff stepping on the main line track until the time he cut off the switch, the car ran about 14 feet; that after he applied the brakes, the car continued on, struck the plaintiff, and traveled 6 or 7 feet further.
 

 One of the defendant’s mechanics testified that he had examined the car; that the brakes and mechanism were in good order; and that under actual test, running between 12 and 14 miles an hour, the car could be stopped at 26 feet.
 

 In the case of Kansas City S. R. Co. v. Ellzey, 275 U.S. 236, 48 S.Ct. 80, 81, 72 L. Ed. 259, the Supreme Court of the United States said:
 

 “This language suggests that the Circuit Court of Appeals thought this case to be governed by the doctrine of the last clear chance. That doctrine, rightly applied in the Chunn Case [207 U.S. 302, 28 S.Ct. 63, 52 L.Ed. 219], amounts to no more than this,-that a negligent defendant will be held liable to a negligent plaintiff if the defendant, aware of the plaintiff’s peril or unaware of it only through .carelessness, had in fact a later opportunity than the plaintiff to avert an accident.”
 

 The same rule was adopted by this court as appears in the case of Rottman v. Beverly, 183 La. 947, 165 So. 153. See, also, Santos v. Duvic, 16 La.App. 105, 133 So. 399; Young v. City of New Orleans, 14 La.App. 306, 129 So. 247; Porto Rico Ry., Light &
 
 *1015
 
 Power Co. v. Miranda (C.C.A.) 62 F.(2d) 479, certiorari denied 289 U.S. 731, 53 S.Ct. 593, 77 L.Ed. 1480; McCormick & Co. v. Cauley (La.App.) 168 So. 783; Monk v.Crowell & Spencer Lumber Co. (La.App.) 168 So. 360; Iglesias v. Campbell (La.App.) 170 So. 265; and Loewenberg v. Fidelity Union Casualty Co. (La.App.) 147 So. 81.
 

 In the instant case, the defendant’s employee knew that he did not have any means of giving a signal of the approach of the motorcar, it being neither equipped with a bell, a whistle, or any other kind of device for that purpose. He was familiar with the mechanism of the car and knew that it would require about 26 feet to stop it, running at a rate of speed of approximately 12 miles per hour. He knew that the public used this path as a crossing to go to the post office and grocery on the other side of the track. He actually saw the plaintiff and two other persons on the right of way and the south or passing track at the crossing, but without attempting to give them any warning, diverted his attention elsewhere and continued on. He realized that he had been intermittently stopping the motor and permitting the car to coast, which caused considerable less noise and therefore lessened the opportunity of pedestrians hearing its approach. He was also cognizant of the fact that he was in charge of and was operating a motor vehicle which was dangerous to life and limb. He admits that he discovered that plaintiff had placed herself in a perilous position with her back turned towards him when he was 40 feet from her. It is conceded that the car could have been stopped within 26 feet running between 12 and 14 miles per hour. He did not explain why the car traveled 14 feet at that slow speed, while he was simply cutting off the switch. Even after the lapse of that distance, he had 26 feet within which to stop, yet he states that he did not stop but struck her and ran 6 or 7 feet further. Under these admitted facts, it is our opinion that the doctrine of last clear chance is applicable and plaintiff is entitled to recover.
 

 After the accident, plaintiff was taken to the Charity Hospital at New Orleans, where, on November 2, 1934, the X-ray picture showed a comminuted fracture of the middle third of the left clavicle (collar bone) with displacements and overlapping of the fragments. A “T” splint was applied and on November 5th, it was removed and the arm was placed in a tri-sling. She also suffered abrasions and cuts on the left foot and bruises over the seventh' and eighth ribs in the area of the left breast. There was also some aggravation of a previously existing ear trouble. The doctor who attended her stated that the period of disability for an injury such as plaintiff suffered was approximately three or four months and that it would not be permanent. She also lost $33.60 wages as a farm hand during the time she was incapacitated. Under the circumstances, we believe that $500 would be reasonable for all items.
 

 For the reasons assigned, the writ of certiorari is perpetuated, the judgments of the district court and the Court of Appeal are annulled, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of Olivia Hicks, wife of Willie Henry, plaintiff, and against the defendant, Texas and New Orleans Railroad Company,
 
 *1017
 
 in the sum of $500, with legal interest from judicial demand until paid; defendant to pay all costs of court.
 

 O’NIELL, C. J., dissents.