## RUSSO et al. v. TEXAS & P. RY. CO.
### No. 1754.

Court of Appeal of Louisiana. First Circuit.

Dec. 9, 1937.

Breazeale & Sachse, of Baton Rouge, for appellant.

Fred G. Benton, of Baton Rouge, and Bouanchaud & Kearney, of New Roads, for appellees.

Le BLANC, Judge.

The plaintiffs, Lawrence J. Russo, Jack Russo, Mrs. Mary Russo Politz, and Mrs. Lena Russo Randazzo, have instituted this suit against the defendant, Texas & Pacific Railway Company, seeking to recover damages in the sum of $15,000, for the death of their father, Salvador J. Russo, who was killed by being run over by one of the trains of the defendant railway company in the town of New Roads, on January 13, 1935. There was judgment below in favor of plaintiffs in the sum of $5,000, and the defendant has appealed.

■ Various charges of negligence are aimed against those in charge of the operation of the train, but the case, as we consider it, is one involving strictly an application of the doctrine recently adopted in Louisiana and known as the doctrine of "discovered peril" in injury cases. That doctrine, as seems to be freely admitted, is a further modification of the law under which a defendant was relieved from liability for damages occasioned by his negligence or fault, when, after having pleaded to that effect, he had shown that the plaintiff, who had been injured, had himself been guilty of negligence in the least degree, thereby contributing to the accident and to his injury. We have of course, as the first modification of that principle of law, the doctrine which is frequently referred to as the "humanitarian doctrine" of the last clear chance, under which it is held that, even though the plaintiff himself had been guilty of contributory negligence, if it were shown that the defendant had had a last clear chance to avoid causing him injury, the plaintiff's contributory negligence would not bar him from recovery. In a large number of jurisdictions, including Louisiana, there was subsequently adopted a rule which in effect was a slight modification of the doctrine of last clear chance. It amounted to this: If a plaintiff had urged the last clear chance doctrine against a defendant, he nevertheless could not recover if it were shown that the defendant had had the last clear chance, and it appeared further that the negligence of the injured party was concurrent with that of the defendant and that his negligence had continued up to the moment of the accident itself. There then came into the jurisprudence, the doctrine of "discovered peril" which was recently adopted in this state in the case of Rottman v. Beverly, 183 La. 947, 165 So. 153. This doctrine is the last modification of the rule of last clear chance and qualifies the rule regarding the liability of the defendant when the concurring negligence of the injured party continued up to the moment of the accident, to this extent: Notwithstanding the concurring and continuing negligence of the injured party, if the defendant actually discovered the danger to which he had exposed himself, and does not use every possible means to avert the accident, he will be held liable.

■■ With these gradual modifications in the law of negligence, it would seem

that it is but a question of time when the law of contributory negligence will have been changed to such extent that it will be of little if any avail whatever to a party having the right to plead it. Be all that as it may, we are confronted with the situation in this case, that the doctrine of "discovered peril" now exists in Louisiana and has to be applied or rejected in a given case in which it is invoked. We are of the opinion however that, because of the gradual development of the law in this direction, and its far-reaching effects when we come to consider and to apply or reject it in a certain case, the facts on which a conclusion is to be reached should be given the closest scrutiny. It is a rather serious reflection on an individual, to hold against him, that on an occasion when both he and the party injured in an accident were at fault, he did not use every possible means to save the injured party from the consequences of his own negligent act. Especially do we think this is so when that individual is in charge of such an instrumentality as a locomotive hauling a train on a railroad track. We have in mind, of course, the fact that a railroad track is more or less a private right of way over which trains have to operate under a certain schedule and according to certain rules and regulations prescribed by governmental agencies such as the Interstate Commerce Commission or the State Public Service Commission, and that the train operated over that right of way consisting of a locomotive and several coaches is an object that is somewhat difficult to handle and control in case of emergency.

With these considerations before us, let us now look into the facts in the present case in their relation to the doctrine of discovered peril as invoked by the plaintiffs. There is little, if any, dispute concerning the facts.

On Sunday, January 13, 1935, following dinner at the home of his son Lawrence, in the town of New Roads, where he was on a periodical visit, plaintiffs' father, Salvador Russo, left to go, apparently, on some errand to his son's moss gin, which is situated near the defendant's tracks several hundred feet west of the New Roads depot. Mr. Russo was a man enjoying good health, and, although 68 years of age, physically alert. His son and one of his daughters who testified stated, on cross-examination, that he was "a little hard of hearing." It was between noon and 1 o'clock when he left his son's home, and it is shown that he was aware of the fact that the train passed New Roads at about that time. He walked down a lane leading from his son's home to the defendants' right of way, known as Bouanchaud lane, and on reaching the point where it intersects the right of way he entered upon the track and turned west or in the direction of the depot and the moss gin. As he walked down the track, Mr. Russo was, to all appearances, a man in the full possession of his physical and mental faculties.

The west bound train of the defendant company was due at New Roads, according to schedule, at 12:58 p. m., and it was on that day running on time, going at about 40 miles per hour. The weather was clear and vision perfect.

There is a gradual curve in the track leading to a distance of about one-third of a mile east of Bouanchaud lane. From that point the track is straight up to the depot, a distance of more than 1 mile. As the train rounded the curve, the whistle was blown. As he emerged from the curve on to the straight part of the track, the engineer could see Mr. Russo walking on the track ahead of him, and, as we measured the distances according to the map introduced in the record, he was then more than one-third of a mile ahead of the train. At that point, the whistle was again blown, and whilst it was a signal for the lane crossing, the engineer states that it also served as a warning to Mr. Russo who was on the track. He did not react to that whistle however and so, as the train moved along, the alarm signals were given. Apprehending again that Mr. Russo was not heeding the signals, the engineer then started to apply the emergency brakes. He estimated that he had then reached a point that was 250 to 300 feet from him, and he was unable to stop the train before it struck Mr. Russo, who was instantly killed by the force of the impact. The train came to a stop a train and a half or two train lengths from the point where Mr. Russo was struck. That distance is not given with any exactness, but we would judge from what testimony there is in the record that it was between 500 and 600 feet. We understand from the engineer's testimony that going at 40 miles per hour, as he had been, it would require about 900 feet for him to bring the train to a complete stop.

As we understand the principle of law invoked by the plaintiffs, when one is faced with a situation which may become one of danger, there is a difference between the duty which he has to discover the situation, and the one to discover the danger itself. Our Supreme Court in the Rottman Case, supra seems to have drawn that distinction, and we so interpreted it in an opinion recently handed down by this court in the case of John Jackson v. James A. Cook. See decision rendered Nov. 6th, 1937, and reported in 176 So. at page 622. In the Rottman Case the court states that the first duty of one who operates an engine or a motor vehicle is to keep a lookout ahead to discover *the presence of those who might be in danger,* which we take to mean to discover the situation, and then, *on actually discovering the danger,* to take every means possible to avert the injury. (Italics ours.)

In this case, when the engineer first discovered the presence of Mr. Russo on the railroad track, in other words when he discovered the situation, he was a third of a mile away from him. At that distance, particularly under the facts in this case, it can hardly be said that Mr. Russo was in danger. A man on a railroad track that far ahead of an approaching train, apparently physically alert, would have ample opportunity, on hearing the train whistle blow, to step off the track and place himself entirely out of danger. Going at the rate of about 40 miles per hour, the train was covering approximately 60 feet per second, and at that rate it would take about 30 seconds to travel a third of a mile. Certainly in half of a minute, Mr. Russo could have stepped off the track, and on to a place of safety, having to cover a distance of not more than 10 feet. That would require about 4 steps for the average man. This we think settles the first point in connection with the duty placed on the engineer. He had discovered the presence of a person on the track and had blown a whistle which served as a warning that the train was approaching. He had the right then, as we view the law, to assume that the deceased, who, to all appearances to him, was a man without infirmities or physical impediments, would react as would a normal individual, and seek a place of safety off the track.

So then, we come to the next and more serious question, and that is when did the engineer *actually* discover that the deceased was in danger or peril. We have italicized this word *actually* because of its importance in relation to the doctrine here under consideration. In reading the cases and what other authorities we find on the subject, we become impressed with its importance. Some jurisdictions don't seem to require that the defendant should have *actual* knowledge of the danger, holding that, if the circumstances were such that he *ought to have known of it,* is sufficient. Others require that he have *actual* knowledge. On this point, we might refer to the very copious annotation found in 92 A.L.R., beginning at page 47, and, as we read the language of the Supreme Court in the Rottman Case, we take it that, as the doctrine is therein construed, actual knowledge is required.

As we analyze the testimony in the present case, it is when the engineer was within 900 feet of the point where Mr. Russo was struck, that he became apprehensive that there was danger. At that point he began to sound the alarm signals, and even then, had Mr. Russo given the least heed, he had time to save himself. The engineer did what we think the average man running a train does under similar circumstances. He himself states on this point: "There is not a day or a trip that we go by there someone is not trespassing on the track. I usually blow the whistle when we are near enough and they get off." But Mr. Russo did not get off, and it was then, and only then, in our opinion, that the engineer had *actual* knowledge of the impending tragedy.

We must bear in mind that, all this time, the train was moving and what with the time it took to set the alarm signals in operation and the engineer's mental reaction to the situation, he may well have gone several feet more before the emergency brakes were applied. As we view the testimony, we don't think that the engineer had much hope of stopping the train before reaching the point where the deceased was at that precise moment. It was impossible then to do so, as it required 900 feet to stop the train. The engineer up to that time, had done all that is usually done by an engineer under the situation which presented itself. Nothing short of having started to bring the train to a complete stop when he was more than 900 feet from the deceased and at which time he had the right to assume

that the deceased would take some steps to avoid being run over, would have averted the accident. This we don't think the law compelled him to do. In Woods v. Longville Lumber Co., 141 La. 267, 74 So. 990, a case cited in the annotation referred to, we find that "the doctrine is not applicable where deceased, after being struck by the tender of a backing engine, was rolled along the track after his presence was discovered, the Court observing that the responsibility of the railroad company depended not upon whether the engineer did all that might have been done to avoid the accident, but upon whether he used the appliances at his command with the promptness expected of a prudent and skilful man." That we believe is the test by which the engineer's conduct should be judged in this case, and, when so judged, we don't think it can be said to have been such as to virtually charge him with having almost wantonly killed the deceased.

The rate of speed at which the train was traveling is strongly stressed as an important element in the negligence charged against those in charge of the train. We do not think that the question of the speed of the train is of very great importance in discussinng the rule or doctrine which we have under consideration before us. Had the deceased himself been free from negligence, it would then be proper to give consideration to the negligence of the engineer (if any) in running at an excessive rate of speed and in failing to observe the movements and actions of the deceased earlier, or in slowing down and bringing his train under control sooner than he did. But as the deceased was negligent, the negligence of the engineer as the proximate cause of the accident can only be considered from the time the engineer actually discovered that the deceased, by his negligence, had placed himself in a situation of danger. In our opinion the case is similar to that of Johnson v. Texas & Pac. Railway Company, 16 La.App. 464, 133 So. 517, 135 So. 114.

Nor do we think there is anything contrary to our view of the case in the cases cited and relied on by the plaintiffs. In the case of Monk v. Crowell & Spencer Lumber Co. et al. (La.App.) 168 So. 360, the train crew knew that the deceased was deaf, and the train could have been stopped after the engineer saw the deceased walking on the track oblivious to the approach of the train. It was there held that, according to the facts set out in the petition, the train crew was aware of the perilous position of the deceased in time to stop the train. In the case of Hicks v. Texas & N. O. Railway Company, 186 La. 1008, 173 So. 745, the defendant was held liable because it was shown that the operator of the motorcar saw the perilous position in which plaintiff had placed herself by her own negligence when the motorcar was within 40 feet of her; that the car could have been stopped within 26 feet at the speed it was traveling, and the operator failed to explain why he had not stopped the motorcar after he discovered the peril in which plaintiff had placed herself. In Iglesias v. Campbell, 175 So. 145, by the decision of the Court of Appeal for the Second circuit, a motorist must be held to have seen what he should have seen, and consequently it is not necessary that he actually see the injured person for the last clear chance doctrine to apply. That to us seems to be inconsistent with the rule as laid down in the Rottman Case, supra which we have interpreted to mean that the doctrine is to be applied in cases only where the defendant had actual knowledge of the perilous situation of the injured person. It is true that the Supreme Court denied a writ in the case of Iglesias v. Campbell, supra, but in view of its clear statement, as we have construed it in the Rottman Case, we think we are justified in applying the rule as we have done in this case.

Neither our sympathy for the plaintiffs in the loss of their father, nor the tragic manner in which he met his death, can justify us in departing from the plain and unmistakable rule laid down as a guide by the Supreme Court in cases of this kind.

Our conclusion being different from that reached by our learned brother below, it becomes necessary for us to reverse the judgment rendered in the district court and to dismiss the plaintiffs' suit and to reject their demand.

For the reasons stated, it is now ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, reversed, annulled, and set aside, and it is now further ordered, adjudged, and decreed that there be judgment herein in favor of the defendant and against

the plaintiffs, rejecting their demand and dismissing their suit at their costs.

DORE, Judge (dissenting).

It is admitted that the only question presented to us is the application of the doctrine of last clear chance, or discovered peril, as recently announced in the case of Rottman v. Beverly, 183 La. 947, 165 So. 153, 157, and its application thereto.

It then becomes necessary for us to determine when the crew of defendant's train discovered the deceased's peril. The majority opinion of this court is to the effect that the train crew only discovered this peril at some five or six hundred feet away from the deceased. I am of the contrary opinion, being my interpretation of the admitted facts that the train crew discovered the peril at least some 1700 feet from the point of the accident. The engineer and the fireman both testified that, when the train executed a curve over 1700 feet away from the point of the accident, they saw or noticed the deceased walking between the rails of the track; they further testified that, from that moment on, they had the deceased under constant observation, and watching every movement of his; they further testified that upon reaching a point some 1700 feet from the deceased (sufficient time to bring the train to a complete stop or to have the train under its complete control) they gave the alarm to attract the attention of the deceased of the oncoming train, yet the deceased did nothing to indicate to them that he had had notice of the oncoming train, they presuming that he would get off of the track and save himself from the danger; they did nothing more but continued to observe the deceased in his walking between the rails, without even turning his head around to notice the train, if any, was approaching him from behind. This, to me, is sufficient to charge defendant's crew with the knowledge that deceased was unmindful of the perilous situation in which he had placed himself, and that there was something radically wrong with the deceased. It is, at this point, that I say that the deceased's peril was discovered by defendant's train crew instead as contended by the majority of this court. The speed of the train was not moderated, or anything else done, save and except at a point some five or six hundred feet away from the deceased (a distance admitted by the engineer to be too short within which to bring his train to a stop to avert the accident) when the engineer gave the stock alarm; to which alarm the deceased did not heed. The engineer only applied his emergency brakes at a point some two to three hundred feet from the deceased, without any hopes however of saving the life of the deceased.

It is from the point of giving the stock alarm that the majority of this court is of the opinion that the defendant's train crew discovered the peril. Yet it must be remembered that the engineer testified that it was physically impossible for him to stop the train, at the speed it was traveling, within such a short space, and that the train could not be stopped in less than 900 feet; it must also be remembered that the train crew testified that they saw and noticed and had the deceased under constant observation for more than a third of a mile, and that they had actual knowledge that the deceased had not reacted to their signal of danger given at a point of 1700 feet away, yet doing nothing but the giving of this alarm when some five or six hundred feet away from deceased. Then, from my point of view, the train crew did a useless thing, serving no purpose whatsoever, and it cannot be now said that the train crew only discovered the peril within the five or six hundred feet of deceased; and in the language of Justice Odom, in the case of Rottman v. Beverly, supra, "But he had waited too long." It is therefore my opinion, as stated before, that the train crew discovered the peril at the first blowing of the whistle, some 1700 feet away, and should have taken precaution, then and there, and not await until too short a distance to stop its train. To say that the engineer only discovered the perilous position of the deceased at any other point does violence to the first statement of the case wherein it is stated that the engineer and fireman both saw and noticed that the deceased had not given heed to the previous warning by the blowing of the whistle at some 1700 feet away.

It is contended that the engineer was justified in assuming that the deceased would step off of the track in time to prevent being hit. The train crew, having discovered the deceased in a perilous position some 1700 feet away, was in no position to indulge in presumptions. They were confronted with a condition, not a

theory. They did nothing to prevent the accident.

We held in the recent case of Jackson v. Cook, 176 So. 622, decided on Nov. 6, 1937, interpreting the case of Rottman v. Beverly, supra, that the negligence of a driver of an automobile must be considered from the time he actually discovered the perilous position of the person and not from the time he should have discovered it. My views in the present case are in accord therewith, in that the engineer in this case did discover the perilous position of decedent some 1700 feet away, ample time to use all possible means at his disposal to avert the accident, and which he failed to do.

The doctrine as announced in the case of Rottman v. Beverly, supra, was affirmed in the case of Hicks v. Texas & N. O. Ry. Co., 186 La. 1008, 173 So. 745; and in that case the Supreme Court held the defendant liable because the operator of the motorcar of defendant *saw* the perilous position of plaintiff in time to avert the accident and he did nothing (as in our case) to avert the same.

This case does not present nor involve the negligence of the engineer to the effect that he is charged with seeing that which he should have seen, but having seen for a distance of over 1700 feet the perilous position of deceased and doing nothing to save him from his eminent death. I am of the opinion that the language of Justice Odom, in the Rottman Case, is applicable to the present one, that is: "But if a plaintiff negligently puts himself in a place of danger and his negligence and danger are actually discovered by the defendant, then there devolves upon the defendant a duty which intervenes or arises subsequent to the negligent acts of the plaintiff, and that duty is to save the plaintiff from the consequences of his negligent acts if he can. The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger (no question here but that the engineer did keep a sharp lookout and did discover the deceased on the tracks). If they perform that duty and discover that some one is in danger, then a second duty arises, and that is to use every possible means to avert injury. If the defendant fails to perform that duty, his negligence in that respect is regarded as the proximate and immediate cause of the injury and the negligence of the plaintiff in putting himself in a place of danger, the remote cause. In such cases the last clear chance doctrine applies even though plaintiff's negligence continues up to the accident."

In writing this dissenting opinion, I am not unmindful of the fact that the engineer was in charge of a locomotive driven on a railroad track, the right of way of which belongs to the railroad which must meet competition, and is regulated by governmental agencies, and that it is an object of difficult control in case of an emergency; I am not also unmindful that the deceased was a trespasser. Yet, I am of the opinion that those in charge should use these instrumentalities having due regard to human life and property.

For these reasons, I am of the opinion that the doctrine of last clear chance is applicable and that the defendant is liable, as held by the lower court, and I am of the opinion that the judgment appealed from should be affirmed. I therefore respectfully dissent.