About 4 o'clock on the afternoon of July 1, 1939, a southbound freight train traveling on the main line of the T. N.O. Railroad, a short distance north of the flag stop at Funston in De Soto Parish, Louisiana, struck and instantly killed an aged negro woman by the name of Jennie Wallace. The children of the victim are the plaintiffs in this suit seeking to recover damages from the defendant railroad company for the death of their mother.
The accident occurred on a clear day and the victim was struck at a point which had been in open view of the approaching train for a distance of some 2400 feet.
Testimony of plaintiff's witnesses convinces us that there existed a well-defined pathway leading from the home of the decedent, Jennie Wallace, which ran south for a distance of approximately 210 feet immediately outside of the railroad right-of-way. At this point the path turned west under the right-of-way fence, crossing the intervening portion of the right-of-way and a passing track paralleling the main line, thence turned north between the main line and the passing track for a distance of approximately 210 feet, at which point the path led off across the main line track to the right-of-way and through the right-of-way fence to the west of the tracks. It is established that Jennie Wallace was accustomed to use this pathway in visiting her daughter, Maggie Barnes, whose house was located several hundred feet northwest of the point where the path emerged from the railroad right-of-way. Immediately prior to the time of the accident, according to the testimony of Maggie Barnes, she saw her mother locking the door of her house and apparently starting down the pathway. From this point to the point on the main line track where the accident occurred there is practically no definite *Page 602 
and credible testimony as to the exact course pursued by Jennie Wallace.
The fireman, at his post in the locomotive of the train, testifies that he first saw Jennie Wallace standing between the rails of the passing track when the train was about a half mile from her position; that she continued to stand at this point until the locomotive was about 300 feet away, at which time she turned and attempted to dash across the main line track. He testifies that he cried out to her and signaled to the engineer, who made an emergency stop, bringing the train, which was traveling at a speed of about 30 miles an hour, to a stop some twenty car lengths south of the point of impact. The body, struck by the locomotive, was thrown clear of the train and came to rest on the right-of-way to the west of the main line track.
As is usual, in cases of this character, the evidence is conflicting and the most serious point of conflict rests upon testimony with reference to the sounding of whistle and bell signals by the crew of the locomotive. The engineer, fireman, conductor and brakeman all testify that both whistle and bell signals were sounded within the 2400 foot space during which the train was approaching Jennie Wallace along a straight track. Numerous witnesses for the plaintiff testify that though they heard the approach of the train, heard it brought to a sudden stop, and heard whistles at or immediately after the time of the stop, they heard neither whistle nor bell signals prior to that time. In spite of this testimony, we regard it as being significant that these witnesses, many of whom were located much farther away from the approaching train than was Jennie Wallace, testified that the noise of the approaching train was clearly audible.
The only other testimony as to the actual occurrence of the accident, which bears upon the actions of Jennie Wallace and her location with reference to the approaching train, is given in the testimony of Maggie Barnes, daughter of Jennie Wallace, and Walter Murray, also a witness for the plaintiffs. Briefly stated, Maggie Barnes' testimony is to the effect that, after seeing her mother lock her door, she next saw her mother some few minutes later running across the main line track, and that the train at the time was about 10 feet away.
Walter Murray, who, according to his testimony, was engaged in an out-of-season rabbit hunt, testified that he heard the train coming, saw Jennie Wallace walking down the track, killed a rabbit before the train got to Jennie Wallace, and in his own words:
"And I stood there and wondered if she was going to cross the track. She just walked on and the train come on down. Didn't blow or whistle.
* * * * *
"When she discovered the train she broke to run across the track and saw she couldn't make it. At her age she couldn't run like me. So she started back up to the track to the path that leads to Maggie's house. When she got nearly to the place the train hit her. I was standing looking right at her. Never had picked up the rabbit.
* * * * *
"When she got in the center of the track she broke to run across the track."
The District Court rendered judgment for the defendant, rejecting the demands of the plaintiffs. No written opinion was handed down by the District Judge and in this connection it is necessary that we give our attention to a point that has been raised in argument and brief.
In brief of counsel for the defendant, reference is made and the text of a letter from the Judge of the District Court is quoted. The letter is dated July 9, 1943, and was written in answer to inquiry by counsel for the defendant as to the reasons for the judgment. This use of the letter was objected to by counsel for plaintiffs on oral argument and has since been brought before the court in the form of a motion by counsel for plaintiffs, re-urging the objection to the use of the letter in question, and, in the alternative, requesting consideration of a letter from the District Judge dated October 3, 1943, directed to a member of plaintiff's counsel.
In view of the fact that the record in this case is entirely devoid of any written opinion or any evidence of reasons for judgment given by the trial Judge, which judgment was dated June 7, 1942, we are of the opinion that statements of the trial Judge made subsequent to the date of judgment, in ex parte communications to counsel for either plaintiff or defendant, are obviously dehors the record, and, accordingly, *Page 603 
may not be considered by this court on appeal. For this reason, the effect of the statements of the trial Judge made in either the letter of July 9, 1943, or the letter of October 3, 1943, will not be considered by this court in its determination of this case.
Counsel for plaintiffs invokes the legal maxim "falsus in uno, falsus in omnibus", with reference to the testimony of the members of defendant's train crew, and earnestly urges that their testimony is unworthy of belief. While it is true that there are certain discrepancies in the testimony given by members of the train crew, we are not of the opinion that they are of such magnitude or consistency as to justify the application of the maxim quoted. Unless it be shown that a witness swore falsely, wilfully or knowingly, the maxim should not be applied and belief refused with respect to the entire testimony of such witness. The doctrine is harsh and its application dangerous and subversive to the ends of justice unless clearly indicated by virtue of careful consideration of all the testimony and its application to the facts involved.
Hope of recovery by the plaintiffs must necessarily rest upon their success in bringing the facts of this case within the doctrine of the last clear chance or the discovered peril doctrine. It was said by this court in Soards v. Shreveport Rys. Co., La.App., 8 So.2d 343, 344, by Judge Taliaferro: "For all practical purposes this doctrine (the doctrine of discovered peril) is the same in scope and effect as the last clear chance doctrine."
In order to justify the application of the discovered peril theory in this case, it would be necessary to definitely establish the fact that, perceiving the actual peril, the members of the train crew failed to exercise every possible means at their command to avoid injury to the person in peril. This necessitates the establishment as a corollary proposition that the danger was discovered in time for precautionary measures to be taken. In our opinion neither of these predicates is satisfactorily established by the facts in this case.
Even accepting the conclusion that no signals were given by the operators of defendant's train, designed for the definite purpose of warning Jennie Wallace of her danger, we still arrive at the inevitable conclusion that Jennie Wallace must have had notice of the approach of the train. Whether we accept the fireman's testimony that she remained standing without attempt to cross the track until the train was approximately 300 feet away, and that she looked at the train, or the story that she was walking between the tracks toward the train, is immaterial. In either case the deceased undoubtedly heard and saw the approach of the train.
It is clear under the jurisprudence of our State that contributory negligence on the part of an injured person, even though continuing down to the moment of the accident, does not absolve a defendant of liability if the peril was actually, or should have been, discovered by the defendant. In such instances it is plain that the defendant is charged with the duty of saving the person in danger even from the consequences of his own negligence. But, it is also true that a defendant is not liable in those cases where accident could not be avoided after the existing peril was, or should have been, discovered.
These rules are subject to modification in those cases where there is something in the action, appearance or situation of the person injured which reasonably indicates that he is either not normal, and therefore not responsible for his actions, or that he is unaware of the approach of the danger, or that he is in such a condition that he cannot remove himself from danger.
There is nothing in the case before us which, even in the slightest degree, would indicate anything in the action, appearance or position of Jennie Wallace which would serve to warn the members of the train crew that she was in danger.
The space between the inside rails of the main line and the passing tracks, where the path followed its course, according to the testimony, was about 8 1/2 feet in width. Jennie Wallace had every reasonable opportunity to avoid any danger, and, indeed, whether she was on the passing track or the path between the tracks, she could not reasonably be considered to have been in peril by all normal and logical standards of definition. Therefore, it would be thoroughly unreasonable to adopt the position that the train crew, or any member thereof, observing a trespasser on the right-of-way, normal in appearance and behaviour, and in no danger, should, nevertheless, be required, under the interpretation of the last clear chance or the discovered peril doctrine, *Page 604 
to bring a train to a stop in order to avoid an accident, which could only be contemplated as possible, and under no stretch of the imagination could be regarded as imminent.
As to the time factor involved, there can be no question of the fact that Jennie Wallace's dash across the main line track, occurring when the locomotive was not more than 300 feet away, gave no time to the operators of the locomotive to avoid the accident through the exercise of any possible means at their command.
There have not been established in this case any of the elements which would result in the imposition of the legal duty upon defendant's employees to see and avoid a danger to the person of Jennie Wallace.
Counsel for plaintiffs cites Russo v. Texas P.R. Co.,189 La. 1042, 181 So. 485, which case also cites Rottman v. Beverly,183 La. 947, 165 So. 153, and Hicks v. Texas N.O.R. Co.,186 La. 1008, 173 So. 745, as authority for the conclusion that when a person places himself in peril, or gives ample notice that he is oblivious that he has entered a place of peril, and when there remains time and opportunity for the defendant, realizing the situation, to act to save such person, failure to so act fixes liability upon the defendant under the doctrine of the last clear chance.
We cannot question such a conclusion when applied to the facts found in the Russo case, nor to the cases cited, but we are definitely convinced that the facts in the case before us do not warrant the application of such a doctrine.
There is a thorough discussion of the doctrine of the last clear chance or discovered peril in the opinion of Judge Hamiter in Eggleston v. Louisiana A.R. Co., La.App., 192 So. 774, and the doctrine is also discussed by our brethren of the First Circuit in the case of Young v. Thompson, La.App., 189 So. 487, and of the Orleans Court in Fontenot v. Freudenstein et al., La.App., 199 So. 677.
We are in accord with the limitations and restrictions placed upon the application of the doctrine in these cases.
For the reasons assigned, the judgment appealed from, rejecting plaintiffs' demands, is affirmed at appellant's cost.
DREW, J., recused.