HAMLIN, Judge ad hoc.
Plaintiff, Board of Commissioners of the Port of New Orleans, instituted this suit against the defendant, Public Belt Railroad Commission for the City of New Orleans, seeking to recover from it as tort-feasor the sum of $3,959.19, paid or to be paid in the future under the workmen’s compensation law to the dependent, Geraldine Marguerite Delavallade, the illegitimate daughter of Joseph S. Delavallade (as a member of the family), an employee of plaintiff who was killed through the alleged negligence of the defendant’s employees in operating a train.
The defendant interposed exceptions of no cause or right of action which were overruled, and then answered denying that its employees were guilty of any negligence whatsoever, and, in the alternative, pleaded contributory negligence on the part of Delavallade.
There was judgment in the court below in favor of plaintiff as prayed for and defendant prosecuted an appeal to this court.
After the matter was heard by us, we were of the opinion that the exceptions of no cause or right of action were meritorious and should be maintained. We dismissed the suit of plaintiff. See La.App., 58 So.2d 306.
The plaintiff then applied for and was granted writs of certiorari by the Supreme Court. After a hearing in the Supreme Court, that court was of the opinion that we erred in sustaining the exceptions of no cause of action and in dismissing plaintiff’s suit. Our decree was reversed and the exceptions of no right and no cause of action were overruled and the case was remanded to us for further proceedings according to law. See 223 La. 199, 65 So.2d 313.
The matter was then reargued before us on the merits of the case.
The evidence is substantially to the effect that on March 3, 1949, at approximately 9:20 o’clock a. m., decedent, Joseph S. Delavallade, had been working in Section 32 of the Dumaine Street Wharf on the river front of the City of New Orleans. He was a member of what is commonly known as the “painting gang”, and shortly before the occurrence which resulted in his death, decedent and a coworker had been ordered by their foreman to go down to Section 41 of the Wharf, a distance of about 180 feet.
In going to their new place of assignment they both walked down the pathway between two spur tracks of the Public Belt.
A pedestrian pathway had been worn between these two spur tracks by the employees of plaintiff arid others whose business continually took them from one section of the Dock Board wharves to the other.
On the morning in question there was standing on spur, track No. 1 a “cut” of four dead freight cars, directly in front of Section 41 of the Dumaine Street Wharf. Decedent’s coworker preceded him a few seconds, went around the rear of the four .cars (the last being a gondola car) and proceeded on into the wharf.
Decedent tarried behind his coworker, and was walking or standing on or near the track in the rear of the gondola car. He was in that position when, without any warning or signal, the gondola car was sud *592 denly backed against him, throwing him under the rear wheels of the car, and inflicting upon' him the bodily injuries which resulted a few days thereafter in his death.
While decedent was behind the gondola car, the employees of defendant backed a “cut” of about fourteen freight cars down this spur track, which finally made contact with,' and were coupled to, the “cut” of the four dead cars, pushing the gondola car against and over the decedent as above set forth.
Five employees of the Public Belt were engaged in this switching operation: the engineer, the fireman, a switchman, who was stationed near the engine, the foreman, who was stationed about midway of the fourteen cars, and another switchman, who was stationed toward and following the front of the fourteen moving cars.
• The evidence further shows that when the backing operation commenced, the engine was about a mile from the first of the four stationary cars, with one switchman not far from the engine, the foreman about 500 feet away, and the other switchman about 100 feet therefrom. Hand signals were given from one individual to the other so as to reach the engineer, upon discerning which the engineer backed the fourteen cars.
The interest of all the trainmen was centered entirely on a proper coupling 'being made to the “cut” of the four dead cars.
The evidence further shows that none of defendant’s employees on the ground looked, or attempted to look, behind the four cars, or that any of them could see behind the four cars "from the positions in which they were. They kept giving the signals from one' to the other;’until the first of the fourteen cars being backed up was coupled to the first of the four stationary cars. It was this coupling operation, which resulted in a jolt, that caused the gondola'car suddenly to back up about six or eight feet, knocking decedent down and under the car as above set forth.
Ernest H. Lockenberg, General Manager of the- Board of Commissioners of the Port of New Orleans (the Dock Board), plaintiff, testified that he has held his present position since December, 1948; that he is familiar with the relations existing between the Dock Board and defendant; that the plaintiff has an agreement with defendant with regard to cleaning out the tracks of defendant which run along the wharves of plaintiff.
Pursuant to the agreement, it is necessary and usual for employees of plaintiff to go upon the tracks of defendant for the purpose of moving debris, trash and dunnage; that the employees of plaintiff clean around the tracks between eight o’clock a. m. and four o’clock p. m., and whenever there were spaces between the cars the “cleaning gang” would clean up those tracks.
In addition to appellee’s “cleaning gang” or -crew, Mr. Lockenberg testified as follows :
“Q. Now, Mr. Lockenberg, in addition to the cleaning crew that you refer to, do any other persons have occasion from time to time to go on- the area occupied in part by the Public Belt Railroad tracks? A. Oh, yes, our repair gangs have occasion to go there from time to time.
“Q. Anyone else? A. Well, of course, there is lots of people engaged by car unloading gangs and stevedore employees. They go on those tracks from time to time.
“Q. As I understand it, the Dock Board, employs a large number of men from time to time in various operations along the docks and wharves? A. Yes. Th.at picture portrays some work that-was done there that probably requires work from the outside. You can see that wharf has been lifted up. The picture reflects that. You see the blocking'underneath.”
On cross-examination Mr. Lockenberg testified:
“Q. Mr. Lockenberg, when your repairmen go on the tracks as you just stated, namely, to repair water connec *593 tions, I understood you to-say, do they go there without warning the Public Belt that they are going there to do that work? A. No. The tracks * * *
“Q. Just tell me do they or do they not? A. No, they don’t warn the Public Belt. They don’t go on those tracks until the tracks are clear * * * until the cars are removed. Then they go on the tracks. They don’t go on the Public Belt track. They figure the Public Belt is not going to come on there as long as they are working there. In other words, a brakeman walks along there and tells them they are going to bump these cars together or they are going to go to work and shift these cars.” (Italics ours.)
Mr. Lockenberg’s testimony is uncontra-dicted, and is corroborated in part by the testimony of Ernest L. Mire, Chief Engineer of defendant, referred to hereafter.
We are of the opinion that decedent was not a trespasser. The spur track on or near which decedent was standing, while laid by defendant, was on a right' of way under the administration and control of plaintiff (Ordinance, Dock Board, May 28, 1946). Under this ordinance, smoking was prohibited “within fifty feet of such bulkheads, docks, piers, wharves, landings * * * under the administration and control of this Board.”
The spur track was within about four feet of the Dumaine Street Wharf. The decedent and other employees of the Dock Board not only had the right to go on, but were continuously and customarily going on and around, this track, in connection with their work for plaintiff, and when going to and coming from their work on the wharves. Numerous other workmen, not connected with the plaintiff, likewise were continuously and customarily going on and around said track.
This line was not the main line of defendant, was not in its yard, but was a side or spur track laid alongside the wharf for, and used exclusively by, defendant in having- box cars “spotted” in juxtaposition to the wharf.
Both plaintiff and defendant rely upon the case of Mercer v. Tremont v. G. R. Co., La.App., 19 So.2d 270, 275. In that case it was observed that “ * * * This permission may be either specific or general and may arise either from express declaration by the possessor of the premises or from the mere following of a custom which has been established to the knowledge of the possessor and accepted or acquiesced in by him. * * * Under the same conditions where permission is neither expressly asked nor granted, nonetheless, the use .by numbers of persons of a trail or a passage, if such use be known and permitted by the possessor of the premises, fixed the status of all those who pass in such manner as that of licensees.”
See, also, Lampkin v. McCormick, Receiver, 105 La. 418, 29 So. 952; McClanahan v. Vicksburg S. & P. R. Co., 111 La. 781, 35 So. 902.
In Doyle v. Thompson, La.App., 50 So.2d 505, it was held (syllabus):
“Licensees and even.trespassers have been allowed to recover from railroads for injuries sustained through negligence of railroad employees.
“Where trespassers on property are habitual and known to the owner so as to impose upon him the duty to anticipate the presence of trespassers( the owner is bound to use reasonable care to prevent.injury to trespasser.”
Wayne E.. Dehner, foreman of Gang. 10 of. plaintiff, testified that he was decedent’s foreman, and that, in obedience to an order from him, decedent left Section 32 of the Dumaine Street wharf to go to Section 41; that decedent left and the witness went to the shed to get two more men. In order to determine exactly what he saw, we quote from his testimony:
“Q. Now, in obedience to that order from you as his foreman, did this man leave Section' 32 preparatory to *594 going to Section 41? A. Well, immediately, because I left him and went to the shed to get two more fellows.
“Q. When you say ‘immediately’, what do you mean by that ? A. Well, he would have had to, because I didn’t go all the way across the shed, and when I came back to Section 41, he was there.
“Q. Where was he ? A. Standing at the end of the cars, a gondola car, as I was coming through the curtain.
“Q. Was that before or after he had been hurt? A. That, I must say instantly. That is how I come to look up, when I heard a crash.” (Italics ours.)
On cross-examination he was shown a written statement he had made, in which he stated that decedent was leaning against the gondola. He also testified, on cross-examination, that decedent was smoking, and was standing between the two rails on which was the gondola that struck him.
On re-direct examination, he was asked:
“Q. Did you see him leaning against the car for any length of time, or all, as you saw him, at one time? A. Well, that was all instantly, sir. J just looked up and seen him.” (Italics ours.)
Again, on re-cross examination:
“Q. Now, isn’t it a fact that you ■saw Delavallade leaning against the •end of the gondola car for at least two ■minutes before the car moved? A. No, sir, I did not, because it was instantly when I looked up. 1 was moving. I couldn’t home seen him there ■only instantly, because there is a wall .there. I had to go through a door. All the other curtains were done.” (Italics ours.)
From the above, we are compelled to con•clude, as reasonable men, that Dehner was .attracted by the crash.
Joseph J. Tranchina, a foreman of plaintiff engaged in repairing the wharf, testified that he saw decedent walking or standing and indicated on an exhibit where he, Tran-china, was standing, which was about 16 feet from decedent. In order to determine what he saw, we quote the following from his testimony:
“Q. Now, what happened to those four or six cars that were standing .there that you saw that time ? A. Well, I heard when they buckled in, and looking around and seeing this man got hit, I hollered to the switchman, which was about eighty feet from me, * * * I says: ‘There’s a man under there.’ By that time, the car rolled about six feet and went over his right shoulder.”
Tranchina further testified that neither the switchman nor the engineer on the switch engine could have seen decedent; that he heard no signals, sound, bells, whistles or other warnings. When Tranchina shouted, “There is a man got hit”, the switchman gave the engineer the signal to stop.
He testified that he didn’t know whether decedent was smoking, and does not know whether he was leaning against the gondola car. When asked how long decedent had been standing where he stated he was standing, he answered that decedent had just walked there to go into the shed. He also testified that decedent “came around that gondola car on the neutral ground” where he was standing. Finally, on cross-examination, he said: ■
“Q.- When, the cars were coupled,, did the coupling of the cars make noise? A. That is what drew my attention, when I heard the noise of the coupling.” (Italics ours.)
We are again compelled to conclude, as reasonable men, that Tranchina was also attracted by the crash, as later in this testimony he stated that decedent had just crossed the first rail going into the shed, and that he did not see decedent stop at any point before he was struck, yet he had his eye on him as he made the turn around the gondola.
*595 Stephen F. Luening, engine foreman, testified that no whistle was blown, no bell was rung, and no one was sent to the end of the line of cars (the end of the gondola) before the cars were coupled. On cross-examination he said:
“Q. What are the duties of switch-men? A: Their duties aré to switch cars, cut cars off, throw switches, flag crossings, when necessary — anything pertaining to the.movement of cars.
“Q. In other words, be on the lookout, is that right? A. That is right.”
Louis Bourgeois, a member of the train crew as field man, made the coupling. He judges that the gondola moved about four feet. He saw no one standing down past the rear end of the gondola car. He testified:
“Q. Now, after the coupling took place, what was the crew going to do, for example?" A. Well, it was my duty to take that walk to the hind end of the train then and shove on back and spot them.
“Q. You were to walk to the hind end of the train? A. And wait for the engine; that is right.”
Ernest L. Mire, 'Chief Engineer of defendant, corroborated the testimony of Mr. Lockenberg, General Manager of plaintiff, to the effect that from time to time there are employees of the Levee Board, the Dock Board and the Federal Government working around Section 41.
Anthony Schmitt, engineer of the train crew, testified:
“Q. Now, then, when couplings of that kind are made, what happens thereafter? A. Well, they just stop there.
“Q. And then what happens? A. Well, if they are going to shove any further back, the field man then will •walk to the hind end of the last car.
$ * * * * *
“Q. , I will now ask you, when couplings 'of that nature are made, what is done thereafter? A. Well, it depends on what we are going to do. If we have to go further back with the cars after coupling, well, then, the field man will walk to the hind end of the last car and give a signal to back up. Now, then, if you are going to pull them ahead, then he will give you a sign to go ahead.
“By the Court: Q. Now, in this case, what did you do after that? A. We just stopped.
“Q. And you stayed there? A. We stayed there, yes, sir.
******
“Q. When you are engaged in the operating of spotting cars along the wharf, and when you have coupled into a car and then you are engaged in coupling operations, what does the crew do thereafter. * * * A. He wants to know what we will do when we make the coupling?
“The Court: That is right. A. We stop.
* * * * ‡ *
“Q. And then what will the crew do? A. It depends on whether they want to go ahead or back up. If they want to back up, like I said, the man will walk, to the hind end and see if everything is clear before we back up. Then we will back up.” (Italics ours.)
We gather the impression from the testimony of Schmitt, Nugent and Lagainst that they walk along to the end of the cars to see if everything is clear after making the coupling only if the train is going to be backed. This is a distinction without a difference.
The fact that the defendant has a rule, and makes it a practice, to have its employees go ahead of its trains when backing them up in a location, such as the one involved herein, fixed it as a duty of such railroad to take the same precaution when coupling up one of its trains to a cut of dead cars standing on the track, where the effect of such coupling is to move or *596 jolt such dead cars with sufficient force and violence to knock down and run over a person standing or passing by the other end of such stationary cars, particularly in an area where persons are continually congregated, as in this area. No hard and fast rule should control. The duty of operators of railroad engines to look ahead and observe never ceases. There can be no half-way application of this rule. Circumstances and conditions existing at the time and place of the occurrence must be considered.
We believe that the switchman, who was nearest the four cars, should have walked this short distance to the rear thereof to see if there, was any object or person behind these cars which would render a switching operation unsafe. It could have been that someone would have left a cross-tie or a piece of iron rail, a large rock or some other object which would have caused one or all of these four cars to turn over and seriously damage any property that fnay have been in them as well as fatally injure someone, as- happened in this case.
We believe that there was gross negligence on the part of defendant’s employees to blindly couple and thus back its cars on this spur track without making any effort to discover whether the tracks or the rear of the four stationary cars were clear or whether there was any person there who might be injured by the operation, or any object on the track which would interfere with the operation.
All the nearest switchman had to do was to walk about 200 feet toward the rear of the four cars and look, and the occurrence would not have taken place. Having failed in this duty, defendant is liable under the last clear chance doctrine.
See Willis v. Vicksburg, S. & P. Ry. Co., 115 La. 53, 38 So. 892; Rottman v. Beverly, 183 La. 947, 165 So. 153; Hicks v. Texas & N. O. R. Co., 186 La. 1008, 173 So. 745; Jackson v. Cook, 189 La. 860, 181 So. 195; Russo v. Texas & P. R. Co., 189 La. 1042, 181 So. 485.
For the reasons assigned the judgment appealed from is affirmed. -
Affirmed.
JANVIER, J., takes no part.