The opinion of the court was delivered by
Miller, J.
The plaintiffs, parents of Lee McGuire, deceased, sue for damages caused by his death under the wheels of defendant’s locomotive while pulling a train of cars on the night of the 24th October, 1892, from the passenger to the freight depot of defendant in, the city of Monroe. The petition charges the engine of the defendant was in bad condition, the steam escaping from the giving way of studs in the steam chest, so as to conceal from the engineer any object on the track and render useless the headlight; that the deceased walking on or near the track of the road was startled by the near approach of the engine, and in his effort to get out of the way stumbled and fell on the track, where he was not seen by the engineer until the train was upon him; that, dragged under the wheels, the engine passed over both legs, from which death resulted. The petition charges the tracks on which deceased was killed pass through ¿he heart of the city, on an embankment persons were accustomed, to walk upon; that but for the escaping steam preventing the engineer’s view of the tracks he would have seen the deceased in ample time to have avoided running over him, and the petition,. *1544 negativing any imprudence on the part of the deceased, charges his death was caused solely by the gross carelessness of the defendant’s agents. The petition claims fifty thousand dollars damages for the pain and suffering of the deceased, surviving his injuries nine hours, and for the injury to plaintiffs for the deprivation of their bon, on whom they depended for support.
The answer avers the proper equipment; good condition of the engine and the competency of the engineer; that the engine was in a down grade from the passenger to the freight depot, and not working any steam at the time of the accident; that the deceased was intoxicated, in that condition was on defendant’s tracks, if not between the rails, alongside or near the tracks; that the tracks are laid on defendant’s private property; that thus a trespasser, the deceased, whether accidentally or intentionally, fell on the tracks in such close proximity to the engine as to render it impossible for the most skilful engineer to avoid the accident.
The answer further avers the deceased was addicted to drink, and when drunk was reckless; on other occasions had placed himself before the engine, and was saved only from death by the interposition of others, and, denying any neglect on the part of defendant’s agents, the answer charges the death was due solely to the recklessness of the deceased.
After answering, the defendant excepted that the petition disclosed no cause of action, which, after argument, was overruled by the court.
There have been two trials of this suit in the lower court before juries. The first verdict was for twenty thousand dollars. The jury on the second trial by a majority repeated the verdict. From the judgment, after the ineffective effort for a new trial, the defendant prosecutes this appeal.
The exception of no cause of action directs attention to the allegations in the petition relied on in defendant’s brief:
“That on said night Thos. Lee McGuire was walking on or near the track of said road, when he was startled by the near approach of said engine, and in his efforts to get out of the way stumbled and fell upon said track, where he was not seen by the engineer until the engine was upon. him, which dragged him under the wheels and passed over both his legs near the body; and that the conduct of deceased in walking along a well-beaten path *1545 was neither imprudent nor rash; that the right eye of deceased had been injured by an operation so as to practically destroy its sight.”
It is insisted by defendant that in thus stating his case, the plaintiffs have excluded their claim for relief. Along with these particular allegations the petition avers that the engine of the defendant was in such a condition as made it dangerous to life; that if the headlight had not been obscured by the escaping steam the engineer would have perceived deceased in ample time to have stopped the engine and saved the life of the deceased, but did not see him until the engine was upon his body, which dragged under the wheels; that he was carried some distance from where first struck; and in the strongest language, the petition attributes the accident to the carelessness of defendants. In view of all the allegations admitted for the purpose of the exception, we can not hold the petition states no case. The particular allegations on which the exception is based, even if isolated, do not relieve defendants from responsibility. Whether the engineer gave proper signals before the engine came upon deceased; whether he could or should have been perceived in time to save his life; whether the defendants could with proper care have averted the killing, are, we think, left in issue to be solved by the testimony. In our opinion, therefore, the exception was properly overruled.
It appears that soon after the train left Shreveport on the eastbound trip, three of the studs of the steam chest gave way, causing a leakage of steam, obscuring the track ahead. The track was obscured, testifies the engineer, according to the speed of the train; if running fast the draft would blow the steam down so he could see over it. When running fast or working no steam there was nothing to obscure the track. The testimony of the conductor and brakeman is that nothing could be seen on the track, the conductor stating the steam blinded him. The accident was deemed of sufficient importance to telegraph the master mechanic the full train could not be rendered, but the running of the locomotive clouding the track seems to have suggested no danger to life, except to increase the watchfulness of the engineer. In this condition, with the defective engine forming a curtain between the engineer and the track, the train reached Monroe. It is claimed that in pulling the train between the passenger and freight depots in that city, during which the deceased was run over, there was no escaping steam. On this point *1546 the testimony is conflicting. But the engineer testifies steam was worked for about one hundred and fifty yards. On starting, the engine was at Third street and the deceased was run over between Fourth and Fifth streets.
The train reached Monroe at night and the accident occurred at 9 o’clock that night, while the train as stated was being pulled between the two depots. The tracks crossing the river at Monroe are laid on an embankment, called by the witnesses the right of way purchased by the company. The tracks are not enclosed. There are a number of streets leading to or intersecting the embankment. There is a pathway at its base, one along either side and another between the tracks on top of the embankment. Persons coming to the embankment, on the streets that lead to it, use the paths on the embankment and walk on the tracks affording, the testimony is, the shortest way to the river and other localities. Among the intersecting streets are Second, Third, Fourth, Fifth and Sixth. We think it shown that the deceased walked on Fourth street till he reached and went on the tracks., He met his death between Fourth and Fifth streets.
The train on the night in question consisted of eleven freight cars, the usual number being larger, more being declined because of the leaking chest. There was besides the usual caboose car in the rear. The train stopped at the passenger depot, near Second street, to land a passenger. With the caboose, stopped at the depot, the engine stood at the Third street crossing. From that point it moved on its course to the freight depot or yards, which we infer are about the Sixth street crossing. The testimony is that steam used only sufficient to start the train gave an impetus sufficient on the down grade to roll the train into the yards. The movement of the train was very slow, four or five miles an hour is the engineer’s testimony, and other witnesses testify about as fast as a man’s walk. With this slow motion the night was clear; the headlight, trimmed and burning, was sufficient to show objects on the track one hundred and fifty to two hundred feet ahead, and it is shown conclusively the train could have been brought to a complete standstill within a very short time, within one hundred and fifty feet states one, others name a shorter distance; but all discussion on that point is obviated by the fact the train was stopped within sixty feet from the time the brakes were applied. But it is in proof the signal for the brakes was not given, nor any whistle *1547 sounded to announce the approaching train until the deceased was almost under the wheels of the locomotive and his death inevitable. The engineer says he saw an object, but very close, and could not tell what it was, immediately called for brakes, reversed engine and gave steam to assist in stopping, but it was too late. The brakeman, standing on the steps of the tender and looking ahead preparing to get down and open the switch, testifies: The engineer told witness bo get off the steps, that he wanted to see what he had struck, and the witness got down, looked under the engine and told the engineer it was a man. The other brakeman and the conductor testify the first intimation they had of the disaster was the jar of the train and the whistle announcing the accident. The deceased was run over at the point indicated by the witnesses as opposite the Voss house, which is about the centre of the square between Fourth and Fifth streets, say a square and a half from the depot.
There the deceased was first struck by the locomotive. There the whistles were sounded, not to give warning of the advancing trains but to summon the conductor and others to the scene. From where the deceased was struck and the brakes applied he was borne the sixty feet, within which the train was stopped, and for that space his bones, blood and flesh laid on the track attesting the different result if the train had been arrested before that space had been reached. It is in proof the engineer remarked he saw nothing until he felt something under the engine. He testifies he remembers no such remark; that after entering the curve after crossing Fourth street he looked back to see if all the cars were coming, and if any signal was given; on looking again at the track saw an object, don’t know how far but very close, and could not tell what it was, immediately called for brakes, reversed the engine and gave steam to back; that the interval between looking, back and then ahead was very short, and it seemed to him if there had been an obstruction on the track before he looked back he would have seen it; nothing, he adds, could have prevented his discovering it, i. e., if it had been there. It is in proof, too, that the deceased, on being drawn from under the engine, said, answering questions, there was no one to blame but himself and whiskey. In his condition, suffering intense pain and under the influence of liquor besides, we can not appreciate that either before or after he was competent to form any opinion on the question of responsibility. He knew he was drunk and injured *1548 on the track and his statement adds nothing to the facts or their probative force.
The engineer’s report, made on the night of the occurrence, is that the motion of the train was four miles an hour; that it was the fault of the deceased, intoxicated and lying on the track, and that the train was stopped within thirty feet. It seems to us the necessary conclusion from all the testimony is that the deceased was not seen nor any effort made to stop the train until the locomotive was upon him, or so near as to make no appreciable difference. It leaves to us the question whether the deceased should not have been perceived, and whether the train could not, with reasonable caution, have been stopped in time to save his life. When taken from under the engine the head and body of deceased was between the tracks, his legs crushed close to the body. For about nine hours he suffered great pain from his injuries, and died from their effect.
The suit is by the parents of the deceased, to whom the law gives the action for damages. Civil Code, Art. 2815; Act of 1884, p. 94. We are asked by defendant to refer the killing of the deceased by this slow moving train, with its bright headlight and on a clear night, entirely to his fault, and hold the defendant free from all negligence. With great earnestness it is pressed on us the embankment was private property, and the deceased a trespasser on it. But the testimony is the embankment running through the city with several intersecting streets was commonly used by pedestrians. As one of the witnesses expresses it, the embankment for walking was preferred to the pathway, often muddy at its base. It is brought to our notice, too, that on other occasions deceased had exhibited recklessness of danger; had laid on the track in front of an approaching train; at other times had jumped on the foot-board of the switch engine to ride through Monroe, and On yet another occasion had avowed his purpose to jump in the river. Along with this line of testimony there is that tending to show that a person, unperceived by the engineer, could get on the pilot in front of the engine. There is in defendant’s answer the suggestion of suicide. We are not at liberty to accept this theory. Self-destruction is not presumed, or much weight due to threats of suicide inspired perhaps by drink, nor is greater importance to be attached to acts of bravado or temerity on other occasions, as denoting the purpose of deceased to throw himself before this train.
*1549 Ifc is in proof that the deceased had been drinking, and was intoxicated on the night of the accident, and in that condition went to the embankment. It is urged by defendant that the deceased fell or put himself on the tracks so suddenly as to afford no time to stop the train. To this contention we have given careful attention. Found on the tracks between Fourth and Fifth streets, we think it shows that he reached the embankment by following Fourth street, on which were the saloons in which he had been drinking. If he had been lying on the tracks when the train began its movement from Third street, considering the slow motion, the good headlight and the quickness within which the train could have been stopped, he must, with ordinary attention of those in charge of the train, have been seen and the train arrested in time to avoid the accident. This conclusion seems to us inevitable, giving effect to all the testimony, in part coming from the engineer himself, especially as to the capacity of the headlight to show objects ahead. Nor do we understand the defendant’s argument to question the illuminating capacity of the headlight, nor the slow motion of the train, or the ease with which it could' have been stopped. The contention mainly relied on by defendants is the sudden falling of deceased before the engine. Defendants rely largely on the testimony of a witness, a railroad employs, produced on the second trial. He was subjected to a rigid cross-examination, and the fact that he was not brought forward for more than a year after the accident is the subject of some comment. His testimony is, the deceased was standing on the corner of Fourth street and the embankment, went staggering down the track, the train then being at the depot, where it stopped a moment to put out the caboose passenger, and the witness testifies that but a moment before the train came along he saw the deceased lying on the track. The witness himself had come to that corner to meet the train. In connection with his testimony the situation of the Yoss house, in front of which deceased was struck, becomes important. If the deceased was not already lying on the tracks when the locomotive started from Third street, then, if the testimony of the witness is to be accepted, the deceased must have staggered from the corner to the centre of the square in the period the-train was moving slowly from the Third street corner. Then, he either fell before the engine came within the distance he-could have been perceived, fixed by the testimony at from one hun *1550 dred and fifty to two hundred feet, and should have been seen in ample time to save him, or he fell after the engine came within that distance and necessarily in full view of the engineer, thus giving him ample time to stop the train. On either theory as to the time he fell, it seems to us negligence in not perceiving the deceased is fixed on defendant. This witness does not state he saw deceased fall. On cross-examination the witness testified that after the deceased went down the track (i. e., toward Fifth street) witness stood on the corner looking toward the engine, then moved away to meet the advancing train on which he expected to get. He testified he was not watching the deceased; saw him start down the track, and paid no further attention to him. The witness was thirty feet back of the engine when it stopped, came up to it after it stopped, and describes the position of deceased. As the witness does not state he saw deceased fall, was not watching him as he started down the track, and paid no further attention to him, we do not attach much weight to the witness’ statement he saw deceased lying on the track, and we are inclined to think witness mingled inference with his personal knowledge, or that, testifying a long time after the accident, his testimony is not accurate. But if this witness, moving away from the corner in a direction opposite to that of the deceased going down the trade, and actually back of the engine when it struck the deceased, could see the deceased lying on the track, the engineer and fireman, both on the engine, certainly could have seen the deceased reeling down and falling on the track. If, therefore, there was the sudden fall of a man staggering down and along, or upon, its track, In our opinion it could not but be seen by the engineer and fireman, if they could see or had been looking ahead. Such a fact would have impressed itself on their minds, and the statement would have come from the engineer of the staggering man and his sudden fall on the track. No such statement is made by him nor by any one until this witness produced on the second trial is brought forward. The fireman on the engine looking ahead saw nothing. Nor the engineer, if either the statement imputed to him is to be accepted or his own testimony adopted. His first intimation, according to the testimony as to his remark, was feeling something under the engine. His own explanation not placing the matter in any better light, as we think, is he saw an object so close as to be practically under the wheels before perceived. Why, on any theory admissible in the *1551 light of all the testimony, he did not see the man before, is, to our minds, to be attributed to inattention, or inability to see at all. It is our conclusion, on the whole testimony, that if the deceased was lying on the track before the engine left Third street, running over him was inexcusable; or if staggering along and falling on the tracks after the engine left Third street, then he should have been perceived within even less than the viewing distance established by the testimony, and the train stopped before reaching him.
It is urged that plaintiff can not recover because intoxicated, in that condition exposing himself on defendant’s tracks, and because a trespasser on private property. Our attention has been directed to that class of railway accident cases in which the fact the injured party was a trespasser has been considered. It has been held one walking on a spur track laid on the surface of a public alley though not imbedded so as to form part of the road-bed is a trespasser, and the railroad owes him no duty except to avoid injuring him if possible after he is discovered. If this is to be accepted and applied by this court to railroads running through cities, it would seem that however gross the neglect in not seeing in time to save his life, a human being on the tracks, there is no responsibility for running over and killing him, if when at last discovered some effort apt to be abortive is made to avoid the calamity. Other cases brought to our notice hold there is no obligation on railroad companies with respect to persons on their tracks, except the general duty to look out for obstructions. This, in our view, is a scant expression of duty, but yet recognizes some obligation on the part of those who run railroads, even with respect to the imprudent who are on the tracks. Our attention is directed also to the recent decision of this court absolving the road from responsibility for running over a man on the tracks. The man was deaf, his infirmity, of course, not known to the train engineer, who, though perceiving the man walking, his back toward the approaching train, naturally presumed he would get out of the way. The man, unconscious of the danger, neither hearing or looking behind, was run over, the train being at full speed, running not in a city but in the country and could not be stopped in time. The Sehexnaydre Case, 46 An. 248; see also 1st Thompson on Negligence, 449.
Our courts have held that railroad companies are not obliged to enclose their tracks. This supposes that reasonable care to avoid *1552 accidents to persons on the tracks will always be used, especially in running trains through cities. Imprudent people will walk on railroad tracks, and while that imprudence is always to be considered an element in adjusting the issue of responsibility, we are not prepared to hold that railroads passing their trains through centres of population, even though their tracks are laid on railroad prop erty are under no obligation to avoid running over people, except that announced in some of the cases brought to our notice and to which is given careful attention. To hold with reference to tracks passing through cities, that the mere general duty, as some of these cases express it, to look out'for obstructions; or, as other cases have it, that running over a person is to be excused because when discovered then the attempt is made to save his life, would, it seems to us, be apt to invite recklessness in the running of railway trains. Our court, as we appreciate the decisions, has never announced, even with respect to trespassers on tracks, the very limited duty of railroad employés expressed in some of the cases urged upon us in this case. We think the measure of responsibility in such cases is better stated by one of the text writers thus: “The company has no right to inflict wanton injury on persons unlawfully on their location, and when human life or limb is concerned the injury may well be considered wanton when, though able to do so, they neglect to arrest the engine which they have good reason to believe will, without an effort to stop it, result in injury to the wrongdoer, not necessarily an outlaw as to his property, still less as to his person.”
Thus it appears that the trespasser, i. e., the wrongdoer, and, we may add, the helpless drunkard on the track, is not withdrawn from all protection, although on the tracks where he has no business to be. See Pierce on Railroads, 330. Mr. Thompson, recognizing some variance in the authorities alluding to the English rule followed in some of our courts that “ except at crossings any man that sets his foot on the track does so at his peril,” yet states the responsibility affirmed by courts with respect to trespassers, thus: “The liability exists if there is any failure on the part of the railroad employés to use proper care for avoiding the accident after the person is discovered on the track, or if that discovery, by using proper care, would have been made and the calamity averted. Thompson on Negligence, p. 449, citing a long array of decisions of the courts of Pennsylvania, Indiana, Ohio, Tennessee and other States.
*1553 On reason and authority the mere fact of trespassing on the-tracks will not excuse a railroad company for destroying life. The obligation of reasonable care to avert such result still remains in the-company. The defence of contributory negligence arising besides, from the intoxication and consequent imprudence of the deceased is. urged with ability and supported by referenc.es to our own as well as the jurisprudence of other States. The common form of statement of the defence imports that relief is denied the injured party if his imprudence has contributed to the accident. The frequency of this class of cases has made all familiar with the general proposition of the defence. The qualification of the proposition enforced, as we think by reason and of authority, is not of such frequent application. It is to be observed that in the strongest expressions in the text-books of contributory negligence such defence is qualified by some reference to the negligence of the defendant. Thus where negligence is the gist of the action it is, to use the language of the text writer, for the jury under the direction of the court to ascertain whether the defendant has failed to exercise due care and by want of it caused the injury, and also whether the plaintiff has failed to exercise due care and by want of it contributed to-the injury. Pierce on Railroads, p. 313, citing the authorities. Thompson cites an English cáse; the syllabus is, if A exposes his. property and B negligently injures it, B must pay damages if by ordinary care he could have avoided the injury. In that case Parke J. observed: “ Although the donkoy was wrongfully in the place, still defendant was hound to go along the road at such a pace as would be likely to prevent mischief; were this not so, one might justify driving over a man asleep. The general proposition it seems to us that negligence of the injured party defeats recovery is well enough, but like all general rules has its qualification, and is not to be understood, nor as we understand the decisions has never been applied, to sanction gross negligence of a railroad company. The drunkard lying on the track exhibits negligence and helplessness. But for all that we do not understand, on any proper application of the defence of contributory neglect, that running over him is to be excused, if by the ordinary precautions it can be avoided. If his imprudence is brought into view as contributing to his death, certainly it would seem some account is to be taken of the carelessness of the train officers, but for which the drunkard’s imprudence would not have *1554 forfeited his life. We therefore can not accept the defence of contributory negligence as dispensing railroad companies from all care to avoid accidents. The defence is in our view subject to a qualification generally accepted. The qualification has become more important with the introduction of railroad lines now spread throughout the country and its application has been suggested as imperatively requisite to guard life and limb against recklessness in the management of railway trains. In the light of our jurisprudence it is not to be said that imprudence of pedestrians, or those driving near or across tracks, justifies the disregard by railroad employés of all precautions to protect the unwary, those of feeble age, the child, or even the helpless drunkard. Nor do we mean that imprudence in going upon tracks is not to be without its influence in protecting railroads from liability.” We enforced that protection in the Schexnaydre Case, 46 An. 248; 1st Thompson on Negligence, 450.
We are safe, we think, in affirming as a rule of protection to limb and life that neglect or imprudence of persons injured by railroad accidents will not shield the company from damages, if with proper care their employés in charge of the train can avoid the injury and fail in that care. Thus qualified, contributory negligence is not to be deemed a license for recklessness and neglect. The qualification is aptly stated in a recent decision of the Supreme Court of the United States,' and in our appreciation finds application to this case. “ Although the defendant’s negligence may have been the primary cause of the injury, yet an action for such injury can not be maintained, if the proximate and immediate cause can be traced to the ordinary care and caution of the persons injured. Subject to this qualification grown up in recent years, that the contributory negligence of the party injured will not defeat recovery, if he shows the defendant might, by the exercise of ordinary care and prudence, have avoided the consequences of the injured party’s negligence.” Grand Trunk R. R. Co. vs. Ives, 144 U. S. 429; the court citing Inland Seaboard Coasting Co. vs. Tolson, 139 U. S. 551, 558; Donahue vs. St. Louis, etc., R. R., 91 Mo. 357; Cooley on Torts, 675, and other authorities; Patterson’s Railway Accident Law, 51, 55 and 61.
The judgment in this case is supported by the verdicts of the juries. The case turns mainly on the issue of fact. The defendant assails the testimony of some of the witnesses as that of discharged employés, and attributes the verdict to jury prejudices. In *1555 view of all this, we have gone over the record with care. That the engine was so defective as to seriously diminish the efficacy of the headlight, designed to guard against accidents, is, we think, shown, and along with the insistence that this defect had no connection with the accident, we can not close our eyes to the statement of the engineer, who, claiming there was no escaping steam unless steam was worked, admits that the invariable rule on starting and switching was to work steam for one hundred and fifty to two hundred yards, then shut off steam and roll down into the yard. It seems to us, this concedes that for part of the distance at least, between the depots, the train was moving toward the deceased with its headlight obscured by escaping steam. The four whistles to which the witnesses testify were signals of disaster, not of caution. The leading fact standing out prominent in the record, is that a locomotive moving at a pace not faster than a man’s walk, and with a headlight capable of revealing objects one hundred and fifty feet ahead, not adopting the greater viewing distance stated by some of the witnesses, runs over and kills a man, not discovered until the wheels are upon him, or but a brief moment before. With the best attention and consideration of this record we are unable to perceive any basis to dissent from the verdict, under our jurisprudence entitled to great weight. As to the view of the trial judge to which our attention is directed in defendant’s brief, his language is he “ maintained the first rule for the new trial for like amount as fixed by the jury as excessive,” and he alludes to the condition of public feeling as his reason for refusing the third trial. If by this he means that his reason for giving the new trial on the first verdict was the amount of the verdict, we concur with him. On the issue of the liability for the company for some amount, we think the solution of the jury correct.
It is difficult to adopt a standard of damages for loss of life. The law gives the surviving parents damages the deceased could have recovered if he had survived the injuries, and damages for the support the parents might have derived from the deceased. The circumstances of each case must control the award. Our courts have allowed from one thousand dollars up to five thousand dollars; rarely more. We believe in other States the verdicts in such cases have been moderated by the sense of justice and of a due regard to all the facts. Under all the circumstances of this case we think one thousand dollars would be proper. While enforcing the responsi *1556 bility of railroad companies in this class of eases, it is equally important verdicts of juries should be reduced when manifestly excessive.
It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed, and that plaintiffs do have and recover from defendant one thousand dollars with five per cent, interest from date of the judgment of the lower court; the-costs of the lower court to be paid by defendant, those of this court by the plaintiffs.