## SHIPP v. ST. LOUIS SOUTHWESTERN RY. CO. IN TRUSTEESHIP.
### No. 5856.

Court of Appeal of Louisiana. Second Circuit.

March 8, 1939.

Rehearing Denied March 31, 1939.

Writ of Certiorari and Review Denied May 1, 1939.

Wilkinson, Lewis & Wilkinson, of Shreveport, for appellant.

Harry V. Booth and H. B. Lingle, both of Shreveport for appellee.

TALIAFERRO, Judge.

This case adds another to the long list wherein a husband and father, after indulging too freely in strong drink in the nighttime, and becoming weary of mind and body, sinks down to rest upon the track of a railway company, falls asleep and is run over and killed by a train. This sad commentary is written of Jimmie W. Shipp, whose widow, individually and as tutrix of their three minor children, prosecutes this suit to recover damages because of his death.

The facts of the case, contrary to the rule, are practically all uncontroverted.

The deceased and his brother-in-law, Buddy Thomas, after becoming intoxicated in the town of Plain Dealing, in Bossier Parish, between the hours of one and two o'clock, A. M., July 4, 1936, decided to go to the home of the latter not far away. They left the business section of the town via Mary Lee avenue, which runs east and west across defendant's tracks about 225 feet north of its depot, and after reaching the tracks they turned south thereon and traveled approximately 125 feet before they decided to sit down and rest. They fell asleep on what is called the passing track, and were there run over by a southbound freight train of defendant about the hour of 2:30 o'clock. Shipp's right foot was cut off and his left leg was badly mashed and fractured. He was carried to a hospital in Shreveport as quickly as arrangements could be made to do so, and died therein fourteen hours later, largely from loss of blood. Thomas lost his right hand and was wounded on the left side of the forehead.

Defendant's depot in Plain Dealing faces east. Between it and the closest street, easterly, there are four lines of tracks, running northerly and southerly, referred to,

beginning at the depot, as being the main line, passing track and team tracks numbers 2 and 1. The switch which admits trains from the main line onto the passing track is 575 feet north of the depot. It is 467 feet from where deceased was run over, and 347 feet from the center of Mary Lee avenue.

The train consisted of 57 cars, engine and tender; not all of the cars were loaded. It was destined for Shreveport but was forced to switch to the passing track to allow a passenger train, due within a short time, to go by. It came to a stop above the switch and then slowly proceeded south over the passing track and admittedly was not traveling over six or seven miles per hour when the accident occurred. Only eleven or twelve of the cars had passed through the switch at that time.

This train was manned by a crew of experienced men. The locomotive's headlight was functioning perfectly. It was capable of projecting a beam 1200 feet ahead and illumined both sides of the track 4 and 5 feet when on a tangent. The engineer and fireman were at their posts in the cab; the former on the right side and the latter on the left side. The fireman died before the case was tried. We are without his testimony. The engineer testified that immediately after the locomotive passed through the switch, and he saw the brakeman there safely board the train, he kept a vigilant lookout down the track but never did see Shipp and Thomas lying thereon. The fireman evidently discovered them only when too late to avert the accident, as he excitedly holloed to the engineer: "Hold it; about to hit a man, or had hit a man." The brakes were instantly applied and the train brought to a stop within 50 or 60 feet. Shipp's body was then under the tender.

Plaintiff, to disclose a cause of action, charged defendant and its train crew with several specific acts of negligence, including the failure to give adequate signals of its approach towards the switch, the street crossing and the depot vicinity. These charges of negligence have all been abandoned, because disproved, excepting those to this effect: That the engineer and other members of the train crew failed to maintain a proper lookout and for this reason they did not discover deceased asleep on its track in time to avoid running over him; that they failed to stop said train when they saw or should have seen, knew or should have known his position of peril upon the track; and, employing these alleged acts of negligence as a premise, it is argued and pleaded that defendant had the "last clear chance" to avoid the accident. This position presupposes negligence on the part of the deceased.

The suit is defended on the ground that the proximate cause of the accident was the fault, carelessness and negligence of the deceased, a mere trespasser who went upon defendant's private property, without right or authority, in an intoxicated condition and fell asleep upon its track, thereby voluntarily placing himself in a position of peril and danger. In the alternative, these acts of negligence on part of deceased are (in a plea of contributory negligence) urged against plaintiff's right to recover.

From a judgment for plaintiff, individually and as tutrix, for $9000, defendant prosecutes appeal.

The only excuse offered by the engineer for not observing Shipp and Thomas before running over them is that on account of some slight curves in the passing track the headlight of the locomotive, while in the curve, did not focus directly between the rails ahead, but to the side. This effort of the engineer to exculpate himself from blame as a or the cause of the tragic accident falls flat because defendant's own assistant division engineer makes it clear that these curves cease at least 200 feet north of where the men were asleep. The train could be and was stopped within 60 feet.

There were no physical objects on the track to interfere with vision except some weeds not over eight inches high. These appear to have not been dense. Visibility that night was good. The engineer testified that when his engine was north of Mary Lee avenue (a distance of approximately 200 feet from the men) he saw on the track below the street some pieces of brown paper. What he meant to say was that he then thought the objects he observed were pieces of brown paper. The lower court inclined to the belief, and so do we, that what the engineer saw were the bodies of these two men prone upon the track. No other person saw any paper on the track. One or two testified that none was thereabout that night nor the following morning.

Notwithstanding the locus was in a square formed by four town streets, was adjacent to the business section of the town of 1500 inhabitants, and that pedestrians by force of habit, as is the uniform custom in like places everywhere, regularly traveled thereon, all to the engineer's knowledge, he dismissed from consideration, if it occurred to him, the possibility that he could be mistaken in the identity of what he saw ahead. He closed his mind to the possibility of error on his part and drove his engine forward without stopping to make an investigation and without reducing its speed so that an accident could be averted if these objects were discovered to be human beings when he was within a few feet from them.

█ The primary purpose of a powerful headlight on a locomotive is to reveal the presence of objects unexpectedly on the track ahead so that the train may be stopped within time to avoid an accident. It is the duty of members of the train crew, in a position to do so, to closely follow the path of illumination, especially in towns and thickly populated sections when speed is materially reduced, to the end that objects on the track may be discovered as soon as the light focuses thereon. If this is not done, the light in such places and under such conditions does not nearly serve the purposes it is designed to serve.

After this train passed the switch above the depot, its lights, due to the movements of the locomotive over the curving rails, swept the entire area before it for several hundred feet. Surely it well covered the distance of 467 feet between the switch and the spot where these men were lying. Shipp wore a light-colored gray shirt and faded khaki pants. His body and that of Thomas, if lying flat, rose nearly one foot above the level of the track. Judging from the nature of their wounds, Shipp's leg was across the rail and Thomas' arm thereon. These physical positions made them easy of observation under the power of the headlight, to any one on the train vigilantly watching the track ahead.

█ We are unable to understand why the presence of these two men was not observed by the fireman and engineer in time to avoid running over them. We conclude that they should have discovered their perilous situation, before it was too late to avert the accident. It was their duty to have done so. The opportunity was present for them to do so. They had the last clear chance to do so. It was gross negligence and carelessness not to have timely seen them. Under the law, their negligence is just as culpable as it would be had they seen the men and not exhausted all means available to avoid injuring them.

Shipp and Thomas were trespassers upon defendant's track. That they were guilty of gross negligence cannot be questioned. But their negligence was passive, inactive. It cannot reasonably be said that this negligence was a proximate cause of the accident. It was a remote cause only,—such a cause as may not, in legal contemplation, be characterized as being proximate to the accident.

██ Whatever uncertainty there may have existed in the jurisprudence of this state on the questions heretofore, it is now well settled:

1. That in considering and applying the doctrine of the last clear chance, persons, operating motor vehicles and railroad trains are, in legal contemplation, held to see what they can see, or by the exercise of due diligence, they could have seen; and

2. That the negligence of the injured or killed person down to the moment of the accident causing the injury or death, is not a peremptory bar to recovery of damages by him or his heirs. Rottman v. Beverly et al., 183 La. 947, 165 So. 153; Hicks v. Texas & N. O. R. Co., 186 La. 1008, 173 So. 745; Jackson v. Cook, 189 La. 860, 181 So. 195; Loewenberg v. Fidelity Union Casualty Co., La.App., 147 So. 81; Iglesias v. Campbell, La.App., 175 So. 145; Davidson v. American Drug Stores, La.App., 175 So. 157; Hantel v. Service Drayage Co., La. App., 177 So. 425.

See also, Kansas City Southern R. Co. v. Ellzey, 275 U.S. 236, 48 S.Ct. 80, 72 L. Ed. 259, in which it is said:

"Under the doctrine of last clear chance a negligent defendant will be held liable to a negligent plaintiff if the defendant, aware of the plaintiff's peril, or unaware of it only through carelessness, has in fact a later opportunity than plaintiff to avert an accident."

The facts of Jones v. Chicago, R. I. & P. R. Co., reported in 162 La. 690, 111 So. 62, are strikingly similar to those of the case at bar. In that case the engineer saw an object on the track (in the City of Ruston, Louisiana), about 300 feet ahead, a distance within which the train could have been stopped. He did not know the ob-

ject was a human being until about 50 feet therefrom, too close to bring the train to a stop before running over the body of plaintiff's husband, lying flat and in an intoxicated stupor. Recovery was allowed. The court held, as reflected from the syllabi, that:

"Railway held liable under last clear chance doctrine for killing drunken man lying on track, where track was used as pathway by pedestrians, as engineer knew, and he saw body, but failed to stop, thinking body was lifeless object, as engineer under such conditions was required to use extra precautions to avoid injury.

"In action for death of drunken man struck by train, determination as to whether engineer was negligent in failing to act in time to prevent accident depended on circumstances such as location of body on track, public's use thereof, and proximity of habitations thereto, if within engineer's knowledge."

McGuire et al. v. Vicksburg, S. & P. R. Co., 46 La.Ann. 1543, 16 So. 457, is also quite similar. It was held therein:

"In an action for damages against a railroad company by the surviving parents for the loss of their son run over and killed by the locomotive, the defense of contributory negligence will not avail if by reasonable care on the part of those in charge of the train, the accident could have been avoided. 2 Thomp. Neg. pp. 1105, 1108; Patt. Ry. Acc. Law, pp. 51, 55; Grand Trunk Railway Co. v. Ives 144 U. S. [408], 429, 12 S.Ct. 679 [36 L.Ed. 485].

"The obligation of reasonable care to avoid accidents on railroad tracks running through cities rests on the railroad companies, although the tracks are laid on an embankment the property of the company. Pierce, R. R., p. 330; 1 Thomp. Neg. p. 449."

See also, McClanahan v. Vicksburg, S. & P. R. Co., 111 La. 781, 35 So. 902; and

Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708.

The very recent case of Miller v. Baldwin et al., 178 So. 717, decided by the Court of Appeal, First Circuit, is also in point.

Appellant, in a splendid brief, has cited many cases involving railroad accidents, in an energetic effort to convince us of error in the judgment of the lower court. Nearly all of these cases involve railroad accidents in the open country where high speed and regular schedules played a part. Some of them deal with the accidental injury to or killing of a person or persons asleep on the tracks by backing trains within the private yard or switching yard of the railway company within the limits of a town or city. The rules applicable to such cases do not find application here or in in the cases quoted from and cited above.

In support of the award to plaintiff, the lower court said:

"On the question of quantum, it is my opinion that the deceased did not earn as much as $600.00 a year, and that he was not a very good provider for his family, and he apparently did not care much for the companionship of his family, because his wife says he was away from home till late at night a lot of the time. He was only 27 years old and had 36 years life expectancy, with the probabilities that he himself might become a burden on someone if he lived his life expectancy or more."

We might add that the deceased had previously lost his right hand. His earning capacity was thereby materially reduced.

All things considered, the amount of damages fixed by the trial judge appears to be adequate.

For the reasons herein assigned, the judgment appealed from is affirmed with costs.