## CHEEK v. THOMPSON.
### No. 2928.

District Court, W. D. Louisiana, Monroe Division.

June 29, 1939.

392

Robert Layton and J. B. Dawkins, both of Monroe, for plaintiff.

Hudson, Potts, Bernstein & Snellings, of Monroe, for defendant.

PORTERIE, District Judge.

This is a suit, in forma pauperis, by Harvey O. Cheek, a resident of Richland parish, Louisiana, against Guy A. Thompson, Trustee for the Missouri Pacific Railroad Company, for damages caused by a Missouri Pacific train, just within the town limits of Rayville, running over and severing his left arm. Cheek, returning home alone, at about 2 a.m. on Saturday night, not drunk or even drinking, took the railroad track. He leaned over to take a gravel out of his shoe (he says), swooned, and stayed there, unconscious, until 5 a.m., when run over.

The Court believes that no further formal and customary statement of fact is necessary as the occurrence will be deline-ated in full by the factual comparison drawn in the opinion; then, consequently, there will not be two narratives—an unfailing source of unavoidable difference, besides making for long opinions.

Plaintiff very properly places his case to fall under the doctrine of Miller v. Baldwin et al., La.App., 178 So. 717, and Shipp v. St. Louis Southwestern Ry. Co., La.App., 188 So. 526. Plaintiff recovers in the two cases. The Court agrees with the plaintiff that these two cases would be the best to quote, if there be any to effeetively sustain his position. The Court has sought to avail plaintiff under either one or both of these decisions and cannot do so because of the factual differences existing, shown hereinbelow:

Instant Case.

(a) The point of accident is just 175 feet from the north corporate limits of Rayville, a town of about 2,500 population; the railroad train was leaving the town and therefore was proceeding towards an area of less habitation; in the direction the train was going, there were fewer and fewer houses. Plaintiff's Exhibit 1 (map) shows only two houses and the Standard Oil Company's Rayville station, with tanks, within a distance of 1,300 feet from the point of accident, going towards town—the direction of increased population; the same map shows a cluster on one side of the track of six little houses within a distance of 600 feet of the place of accident, going away from town; on the other side of the track, not a single house.

(b) The time of the accident was at 5 a.m.; it was shown by a number of witnesses that pedestrians along the track at that hour were very few and far apart; there was no industry nearby of any kind or character to which laboring people might have been reporting to work.

(c) There is complete and uncontradicted proof of continuous automatic bell ringing from the time of leaving the station at Rayville to the place of accident; also the usual and regular blowing of the engine whistle at the side-road crossings from the station to the point of accident.

(d) It was proved that a road, not far from the track, was available to the plaintiff and to the general public. It was also proved that the track was little used by anyone.

(e) There were dogs on the track at this very point of accident; to be frank, when the Court read, before trial, in the answer

of defendant that several dogs, maybe as many as five or six, were on the track, and averred that fact as a point to develop non-liability, the Court was dubious, if not amused. Witnesses of the plaintiff, however, testified that they were awakened some fifteen or twenty minutes before the actual accident by the barking of dogs on the railroad track—notably the people living in the Taylor Watson house, immediately opposite the point of accident and the only house near the point of accident.

(f) It was proved beyond question that plaintiff lay on the track parallel and next to the right hand rail going north (the direction of the train) with his feet towards the oncoming train, his left arm lying limply over the rail. His body was nestled, as it were, next to the rail where there is less gravel ballast.

(g) The dogs were on and about the track, just before the accident. The crew just saw dogs, and no more. Nothing about the appearance of the dogs indicated an object on the track. The evidence is clear that because of the dogs the crew never knew nor had reason to believe that there was anything on the track until the engine had reached within fifty or sixty feet from the man.

(h) Plaintiff was dressed in a cream-colored shirt, grey trousers, no coat, and a tan hat—all colors that made no contrast to the track cover, ballast of mixed small rock and gravel.

(i) Plaintiff's own petition places the train as traveling not over ten miles per hour. From the time of the discovery that an object was on the track to the time of actual stoppage, a total distance of about 180 feet was traversed. This is represented by the items of 50 feet, from the point of discovery to the man, 75 feet for the length of the engine and tender, 45 feet for the length of one box car, and 10 feet for the front truck of the second box car.

In the instant case no one of the train crew, no one else, as far as that be concerned, from the direction of the oncoming train, could see a thing because of the dogs—neither was there an object that could have been a piece of paper, or could have been a hat, or could have been a person to be seen. Nothing was seen until about 50 feet, and then it proved to be a man, and too late.

The engine crew places the speed at between eight and ten miles an hour. There were twenty-five cars making up the train.

(j) It was proved that everything about the train, its equipment and all of its safety appliances, was in good order.

(k) It was proved that the engineer used all levers and applied all brakes promptly, upon discovery that there was a man on the track.

(l) The engine, one freight car and the truck of the second freight car went beyond the man, severing the left arm of his body. The plaintiff states he never knew a thing until the day following, when at the hospital.

(m) The morning was clear, the sun was just above the horizon, and there was no fog or smoke.

(n) The accident occurred at a point of curvature of track, preventing the engineer, who was on the convex side, from actually being able to see the point of accident for several hundred yards before injury.

In this case, none of the crew ever realized there was an object of any kind, much less a human being, on the track, until about 50 feet away; all they saw was a number of dogs, which was not uncommon, but which effectively hid the plaintiff, especially in his peculiar position

Miller v. Baldwin, La.App., 178 So. 717.

(a) "The preponderance of the evidence is to the effect that the tracks from Basile *crossing into the town of Eunice* were used very extensively and frequently by pedestrians both day and night." 178 So. at page 719. (Italics supplied)

There was no public highway offered the public, supplementing the passage on the track. "* * * a section of country that was thickly populated and where pedestrians *habitually* used the tracks, to the knowledge of the railroad employees, and at a point where several highways crossed the railroad in close proximity to the point where the deceased was killed." 178 So. at page 718. (Italics supplied)

"The railroad track for more than a mile in both directions from the point where deceased was struck is perfectly straight. * * *" 178 So. at page 718.

(b) The time of the accident was at 2:30 a. m.

(c) "The gravel was level with the ties, and as the rails are only about 5½ inches high, it follows that a human body of the size of the deceased would extend several inches above the top of the rails." 178 So. at page 720.

(d) There were no dogs or any other animals or objects to obstruct the view.

(e) The body was dragged a distance of from 225 to 450 feet. This would be the limits of distance the train took to stop.

(f) In 178 So. at page 721 of this case, the joint evidence of the fireman and the engineer is that they knew not that a human body had been run over, except at the moment of passing over the body.

(g) The speed of the train was at a rate of 45 to 50 miles per hour.

Shipp v. St. Louis Southwestern Ry. Co., La.App., 188 So. 526.

(a) "The engineer testified that when his engine was * * * (a distance of approximately 200 feet from the men) he saw on the track below the street some pieces of brown paper." 188 So. at page 527. The Court again says: "What he meant to say was that he then thought the objects he observed were pieces of brown paper. The lower court inclined to the belief, and so do we, that what the engineer saw were the bodies of these two men prone upon the track." 188 So. at page 527.

(b) "* * * the locus was in a square formed by four town streets, was adjacent to the business section of the town of 1500 inhabitants, and * * * pedestrians by force of habit, as is the uniform custom in like places everywhere, regularly traveled thereon, all to the engineer's knowledge. * * *" 188 So. at page 528.

(c) There were two men in this case, asleep, of course, and since the engineer and fireman never saw them before passing over them, the evidence is wanting as to their exact position. To quote from the case, "We are unable to understand why the presence of these two men was not observed by the fireman and engineer in time to avoid running over them." 188 So. at page 528.

(d) The accident happened about the hour of 2:30 a.m.

(e) "After this train passed the switch above the depot, its lights, due to the movements of the locomotive over the curving rails, swept the entire area before it for several hundred feet. Surely it well covered the distance of 467 feet between the switch and the spot where these men were lying. Shipp wore a light-colored gray shirt and faded khaki pants. His body and that of Thomas, if lying flat, rose nearly one foot above the level of the track. Judging from the nature of their wounds, Shipp's leg was across the rail and Thomas' arm thereon. These physical positions made them easy of observation under the power of the headlight, to any one on the train vigilantly watching the track ahead." 188 So. at page 528.

(f) The train consisted of 57 cars, engine and tender, and was traveling not over 6 or 7 miles per hour.

This Court in writing its opinion must subscribe to the Louisiana jurisprudence. The most favorable and recent Louisiana cases for the plaintiff, as said before, are the two cases of Miller v. Baldwin and Shipp v. St. Louis Southwestern Ry. Co. The Shipp case rehearses the former applicable jurisprudence and we therefore quote its brief in full:

"Whatever uncertainty there may have existed in the jurisprudence of this state on the questions heretofore, it is now well settled:

"1. That in considering and applying the doctrine of the last clear chance, persons, operating motor vehicles and railroad trains are, in legal contemplation, held to see what they can see, or by the exercise of due diligence, they could have seen; and

"2. That the negligence of the injured or killed person down to the moment of the accident causing the injury or death, is not a peremptory bar to recovery of damages by him or his heirs. Rottman v. Beverly et al., 183 La. 947, 165 So. 153; Hicks v. Texas & N. O. R. Co., 186 La. 1008, 173 So. 745; Jackson v. Cook, 189 La. 860, 181 So. 195; Loewenberg v. Fidelity Union Casualty Co., La.App., 147 So. 81; Iglesias v. Campbell, La.App., 175 So. 145; Davidson v. American Drug Stores, La.App., 175 So. 157; Hantel v. Service Drayage Co., La. App., 177 So. 425.

"See, also, Kansas City Southern R. Co. v. Ellzey, 275 U.S. 236, 48 S.Ct. 80, 72 L. Ed. 259, in which it is said:

"'Under the doctrine of last clear chance a negligent defendant will be held liable to a negligent plaintiff if the defendant, aware of the plaintiff's peril, or unaware of it only through carelessness, has in fact a later opportunity than plaintiff to avert an accident.'

"The facts of Jones v. Chicago, R. I. & P. R. Co., reported in 162 La. 690, 111 So. 62, are strikingly similar to those of the

case at bar. In that case the engineer saw an object on the track (in the City of Ruston, Louisiana), about 300 feet ahead, a distance within which the train could have been stopped. He did not know the object was a human being until about 50 feet therefrom, too close to bring the train to a stop before running over the body of plaintiff's husband, lying flat and in an intoxicated stupor. Recovery was allowed. The court held, as reflected from the syllabi, that:

" 'Railway held liable under last clear chance doctrine for killing drunken man lying on track, where track was used as pathway by pedestrians, as engineer knew, and he saw body, but failed to stop, thinking body was lifeless object, as engineer under such conditions was required to use extra precautions to avoid injury.

" 'In action for death of drunken man struck by train, determination as to whether engineer was negligent in failing to act in time to prevent accident depended on circumstances *such as location of body on track, public's use thereof, and proximity of habitations thereto, if within engineer's knowledge.*' (Italics supplied)

"McGuire et al. v. Vicksburg, S. & P. R. Co., 46 La.Ann. 1543, 16 So. 457, is also quite similar. It was held therein:

" 'In an action for damages against a railroad company by the surviving parents for the loss of their son run over and killed by the locomotive, the defense of contributory negligence will not avail if by reasonable care on the part of those in charge of the train, the accident could have been avoided. 2 Thomp. Neg. pp. 1105, 1108; Patt. Ry. Acc. Law, pp. 51, 55; Grand Trunk Railway Co. v. Ives, 144 U.S. 408, 429, 12 S.Ct. 679, 36 L.Ed. 485.

" 'The obligation of reasonable care to avoid accidents on railroad tracks running through cities rests on the railroad companies, although the tracks are laid on an embankment the property of the company. Pierce, R. R., p. 330; 1 Thomp. Neg. p. 449.'

"See, also, McClanahan v. Vicksburg, S. & P. R. Co., 111 La. 781, 35 So. 902; and Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708.

"The very recent case of Miller v. Baldwin et al., 178 So. 717, decided by the Court of Appeal, First Circuit, is also in point."

In applying paragraph 1 of the above brief of the Louisiana jurisprudence to the instant case, the doctrine of the last clear chance being applicable, we find the persons operating the railroad train were not neglectful at any time. There was no fault with the train's equipment and safety appliances. The bell was continually ringing from the railroad station, quite a distance back, up to this point of accident, all within the corporate limits of the town of Rayville. There were full and regular whistle blasts given at all crossings; this matter of fact is attested to by witnesses not in the employ of the railroad. And finally, and what is most important of all, there is nothing that the train crew failed to see which it could have seen, in the opinion of this Court. The presence of the dogs on the track and their actions did not indicate to the train crew that there was anything else but dogs on the track. The dogs were not in a huddled position as if eating or fighting for something to eat on the track, nor were they in the position as of barking at an object. When the object on the track, a man, was seen, the distance was 50 feet, more or less, and it was then too late, under the doctrine of last clear chance, for the train crew to avert the accident. The crew did all in its power to stop in time.

Under paragraph 2 of the applicable Louisiana doctrine, quoted above, we subscribe to the view that "the negligence of the injured person down to the moment of the accident causing the injury, is not a peremptory bar to recovery of damages by him."

The grossest degree of negligence is found in the present plaintiff. This fact does not affect the logic of the principle, however, because once the negligence of plaintiff is excused, it matters not the degree—it is all excused.

Why was it gross negligence? The injured man knew of his physical ailment, as he himself admitted that he had had spells of this character four or five times before. Yet he took the track and not the available highway.

Mrs. Fuzzell and some other witnesses living in the neighborhood said that twice before they had found him asleep on this railroad track and had awakened him and begged him to move away, telling him that the train would run over him. He knew his failing, had had two admonitions, yet he chose to return over the track.

By the preponderance of evidence, applying the doctrine of last clear chance in this case, the defendant was never aware of the plaintiff's peril, or unaware of it through carelessness on its part, so that it had a later opportunity than the continuously neglectful plaintiff to avert the accident.

We believe that this case is differentiated from the case of Jones v. Chicago R. I. & P. R. Co., 162 La. 690, 111 So. 62, because the only things seen on the track by the crew were several dogs, nothing else to cause alarm. We are not going to make it the law that a train is to retard its speed (this train was going slowly enough already) or to stop because there are dogs on the track. Regulation is rather strict on railroad companies as to their schedule and it would seem that public service generally should be more important than the life of a dog or two. The evidence is beyond question as to the presence of the dogs, because the presence of the dogs was testified to not only by the train crew but by several witnesses, and notably witnesses of the plaintiff. That there was any object at all besides the dogs could not be seen by any of the crew until about fifty feet from the place of accident, too close to bring the train to a stop before running over the man. The discovery of the object and the fact that it was a man were simultaneous.

The position of the body on the track, as previously described, the color of the man's clothing harmonizing so closely with the color of the track's ballast, the want of proximity of habitation to the place of accident, the slight use of the track by pedestrians, the nearness of a public way, the effective obstruction to the view of the man by the crew because of the dogs, take the instant case in many particulars from the Louisiana doctrine above quoted, placing liability on the defendant railroad.

Reasonable care was exercised by all those in charge of the train. Everything humanly possible that could have been done to avert the accident was done; and the plaintiff is found finally to suffer his injury from his own gross neglect. Because of the peculiar physical facts it is unnecessary to classify the plaintiff as to whether he was a trespasser or a licensee. Even if classed a licensee, the more favorable classification to him, the Court's view could not be different.

Plaintiff's claim is rejected at his cost.